# JOHNSTON v. STANDARD MINING COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE DISTRICT OF COLORADO.

No. 133. Argued March 10, 1893. — Decided March 27, 1893.

The mere institution of a suit does not of itself relieve a person from the charge of laches; and if he fail in its diligent prosecution, the consequences are the same as though no action had been begun.

Where a question of laches is in issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known to him were such as to put the duty of inquiry upon a man of ordinary intelligence.

The duty of inquiry is all the more peremptory when the thing in dispute is mining property, which is of an uncertain character, and is liable to suddenly develop an enormous increase in value.

In this case it is clear that the plaintiff did not make use of that diligence which the circumstances of the case called for.

THIS was a bill in equity to establish the ownership of the plaintiff in one-fourth of a mining claim, known as the "J. C. Johnston lode," and for a decree that the defendant be required to execute a deed of the same, and to account to plaintiff for one-fourth of the net proceeds of the mine. The bill, which was originally filed in the state court against the Standard Mining Company, Isaac W. Chatfield, and other defendants, was subsequently removed to the Circuit Court of the United States, upon the petition of the Standard Mining Company, as a suit involving a separate controversy between itself and the plaintiff Johnston.

The bill averred in substance that on September 14, 1880, plaintiff, being then the owner and in possession of an undivided half of the J. C. Johnston lode mining claim, situated in the Roaring Fork Mining District, Pitkin County, Colorado, executed a certain title bond, whereby he agreed to sell and convey to the defendant Chatfield an undivided one-fourth interest in such mining claim, with other property, for a consideration of $1200; that on October 12, 1880, plaintiff executed to Chatfield a deed of his entire interest in such mining claim for a nominal consideration of $1200; that his interest at the time

was an undivided half, and that such conveyance was in pursu-ance of said bond as to a one-fourth interest covered by said bond; and as to the remaining one-fourth interest, such convey-ance was in trust that Chatfield, with Charles I. Thomson and Daniel Sayre, who were his legal advisers and were also made defendants, would defend Johnston's title to this claim against another, known as the Smuggler claim No. 2, with which these parties represented to him that it was in conflict, and would perfect plaintiff's title to the J. C. Johnston claim by obtain-ing a patent therefor, and would thereupon convey to plaintiff an undivided one-eighth interest in the property free and clear of all costs and expenses of the patent proceedings and of the threatened litigation with the Smuggler No. 2 claim, and of all charges, incumbrances, and assessments, and would hold the remaining one-eighth of said title for Thomson and Sayre as compensation for their legal services and for the costs of litiga-tion; "but it was expressly agreed and understood that, if said services should not be necessary and should not be performed, said Thomson and Sayre should receive nothing, and that the said remaining one-eighth should be reconveyed to plaintiff."

The bill further averred that, upon the solicitation of these parties, plaintiff was induced to employ Thomson and Sayre upon these terms, and thereupon executed the deed to Chat-field of all his interest in the claim, and in pursuance of such agreement, a contract in writing was drawn up, and signed by Chatfield and plaintiff, whereby the former agreed, upon perfecting the title to the claim, to convey to plaintiff an undivided one-eighth free and clear of all expenses and of the proposed litigation; that plaintiff did not retain a copy of this contract, but that the same was left in the possession of Thom-son and Sayre, who promised to have the same recorded, but failed to do so.

The bill further averred that on December 14, 1880, Chat-field conveyed to the Fulton Mining Company, also made a defendant, all his interest in such claim; that such convey-ance was made before the incorporation of the Fulton Mining Company, and, therefore, that it acquired no title by said con-veyance; that the incorporators of said Fulton Mining Com-

pany were the defendants in this suit, including Chatfield, Thomson and Sayre, and the same defendants were all directors of such company for the first year of its existence, and that all of them had, before such conveyance by Chatfield to the company, full knowledge and actual notice of the uses and trusts upon which Chatfield held plaintiff's title as aforesaid; that in February, 1881, the Fulton Mining Company made application for letters patent for the J. C. Johnston mining claim; and that letters patent were issued to said mining company, bearing date February 21, 1884, but that plaintiff did not learn of the issuance of said patent until February, 1885; that, upon learning of the same, plaintiff immediately made demand upon Chatfield individually and as manager of the Fulton Mining Company for a conveyance of his interest in the property according to plaintiff's contract with Chatfield, which demand was refused.

The bill further charged that, from time to time, after the execution of his contract with Chatfield, and until he learned of the issuance of the letters patent to the Fulton Mining Company, he frequently inquired of Chatfield as to the progress that was being made to perfect the title to the J. C. Johnston claim, and that Chatfield always answered such inquiries that the patent had not been received, but that application had been made therefor, and that everything would be all right; that he had implicit confidence in said Chatfield, and knowing also that the issuance of United States patents for mining claims was usually attended with long delays, plaintiff never suspected that anything was wrong until he learned of the issuance of the patent and until his demand was refused as aforesaid. It was further charged that no *bona fide* suit or proceeding was ever brought or threatened by the claimants of Smuggler No. 2 claim, as was represented by Chatfield, Thomson and Sayre; that the only such suit ever brought by any claimants of Smuggler No. 2 was begun in the Circuit Court of the United States in May, 1881; that a demurrer to the complaint was filed on July 20, and no further proceedings were taken until December 18, 1882, when the cause was dismissed by stipulation of

the parties, but that such proceedings were taken without the knowledge or consent of the plaintiff; that such suit was without foundation or merit, and that said Thomson and Sayre caused the same to be brought only that they might appear to defend the same, and thereby apparently perform the services for which they were to receive one-eighth share of said Johnston claim. Plaintiff further averred that he did not discover the fraud practised upon him by the said Thomson and Sayre until April, 1885, when he was informed of the same by his attorney, who, at his request, investigated and reported the facts in relation thereto.

The bill further averred that the Fulton Mining Company conveyed the claim to one William J. Anderson, who was made a defendant, by deed dated July 5, 1886, for a consideration of $125,000; and that Anderson attempted to convey the same to the Standard Mining Company, now the sole defendant, by deed dated June 17, 1887, for a consideration of $2,500,000, but that all of said parties had full knowledge and actual notice of the plaintiff's interest in the property, and the trusts upon which Chatfield took title thereto, and that such conveyances were fraudulent and void as to plaintiff, and made with special intent to defraud and hinder him.

He further averred that the several defendants had mined large quantities of ore from the claim; and prayed that he be adjudged to be the owner of one-fourth of such claim; that the defendant be decreed to execute a deed of the same to him, and be required to account to him for the proceeds of the ore, and that, in case such relief could not be granted, for a personal judgment against Chatfield for the value of an undivided one-eighth of such mine, and against Thomson and Sayre for the value of another one-eighth, and for an accounting from them personally for the ores mined.

The Standard Mining Company filed its answer to this bill in the Federal court, and upon the issue formed between the parties testimony was taken, the case heard by the District Judge, and on March 1, 1889, an interlocutory decree entered substantially in accordance with the prayer of the bill, and an accounting ordered. The defendant immediately applied for

a rehearing, and the case was reheard without reference to the grounds relied upon in the petition for rehearing, which did not raise the question of laches, and the case was again taken under advisement, when the court delivered a second opinion, dismissing the bill upon the ground of laches. Thereupon plaintiff filed a petition for a rehearing upon this question, which was denied by the court without argument. Plaintiff thereupon appealed to this court.

*Mr. Hugh Butler,* (with whom was *Mr. Leon D. Geneste* on the brief,) for appellant.

*Mr. C. S. Thomas* for appellee.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The bill was dismissed in the court below upon the ground of laches, and the correctness of its ruling in that particular is the first question presented for our consideration.

The gist of the plaintiff's bill is the alleged fraud of Chatfield in failing to carry out his contract of October 12, 1880, wherein he agreed, that in the event of succeeding in certain legal proceedings to be instituted by him for vesting the legal title to the Johnston claim in the plaintiff, he would convey to plaintiff an undivided one-eighth interest in the lode free and clear of all expenses incidental to the litigation; plaintiff upon his part agreeing to pay an undivided one-eighth of the expenses which should accrue in the developing and opening of the lode. The lode in question had been located on the preceding 4th of August by Johnston as owner of one-half, Joseph W. Adair as owner of one-fourth, and George A. Crittenden as owner of the remaining fourth. It seems there was a conflict between this and another mining claim known as Smuggler No. 2, and the agreement with Chatfield was made for the purpose of contesting this claim.

It also appeared that plaintiff was one of the parties who had located the Smuggler No. 2 claim; that early in the year

1880 plaintiff had entered into what is known as a grub-stake contract with one Acheson individually and as agent and attorney-in-fact of Edward Dunscomb and James E. Seaver, whereby plaintiff agreed to locate mining claims on behalf of himself and these parties, in consideration of which they agreed to furnish all the supplies and pay all the expenses which should be required in prospecting, locating and developing such mining claims; that, in pursuance of such agreement, plaintiff found indications of a silver-bearing lode on Smuggler Mountain, in the Roaring Fork Mining District, and on April 15, 1880, located Smuggler No. 2 mining claim upon this vein; that such location was made in the joint names of plaintiff, owner of one-fourth, and the wives of Dunscomb and Seaver, each claiming three-eighths; that, after such location and before the discovery of any vein within the limits of the Smuggler claim, the other parties abandoned such claim, failed to furnish the necessary supplies and money to the plaintiff, who continued to develop and work the ground on his own account and at his own expense; that, on August 4, 1880, plaintiff discovered within the limits of said Smuggler claim a vein or lode, and thereupon duly located the same as the " J. C. Johnston lode" mining claim for the use of himself, Crittenden and Adair, as above stated; that, upon learning of such discovery and location, Acheson, Dunscomb and Seaver negotiated with Crittenden and Adair for the purchase of their interests in the Johnston claim, and on August 10, 1880, purchased the same for $1000; that at the same time they negotiated with plaintiff and agreed to purchase his one-fourth interest, but failed to do so.

Plaintiff further contended that these facts respecting the location of the two claims, and the negotiations with Acheson, Dunscomb and Seaver, were known to Chatfield, Thomson and Sayre, who still insisted that there were certain parties who, as grantees of Dunscomb and Seaver, claimed title under the Smuggler location adversely to plaintiff's interest in the Johnston claim, and that legal proceedings had already been, or were about to be, commenced to enforce said claims; that Chatfield, Thomson and Sayre represented that it was desirable

to perfect the title of the Johnston claim by obtaining a patent therefor, and to this end they had secured or would secure a conveyance from the owners of the other half of the Johnston claim. They further represented to him that, for the better management of the property, they proposed to organize a stock company, and to that end they had secured the other half interest in the Johnston claim; and that the defendants were then associated together, and had agreed to organize a stock company for that purpose, and that the Fulton Mining Company was shortly thereafter incorporated by them. These conflicting claims with regard to the ownership of the property within the limits of these two claims were evidently the foundation of the agreement of October 12, 1880, whereby Chatfield agreed to clear up the title to the property, and to convey one-eighth to the plaintiff.

Most of the testimony was directed to the relative merits of the Smuggler No. 2 and the J. C. Johnston locations, apparently upon the assumption by the defendant that the plaintiff was bound to prove that the owners of the Johnston lode had the better title. Plaintiff, however, contends that the contract of October 12, 1880, and the other conveyances made about the same time, when read in the light of the surrounding circumstances, are conclusive evidence of the following: First, that the interest actually purchased by Chatfield in the Johnston mine was a quarter interest, and that the remaining fourth of Johnston's interest in the property, which he deeded to Chatfield, was in trust; second, that this fourth interest was the interest referred to in the contract as being claimed adversely to Chatfield by certain persons; third, that the defendants Thomson and Sayre were employed to institute the "legal proceedings" mentioned in the contract, and were to receive as a contingent fee for their services in that behalf an eighth of the Johnston mine, in case those proceedings were successful; fourth, that in such case Johnston was to receive the remaining eighth of this contested quarter; fifth, that the "legal proceedings" mentioned contemplated and included an application for letters patent and the acquisition of the government title, as well as a suit of some kind.

Upon the basis of the fifth and last proposition above stated the plaintiff contends that it would follow that a cause of action did not accrue to him until a patent had been issued by the government, which did not take place until July, 1884, and that as the plaintiff was not informed of this fact until some time in 1885, and as he filed his first bill against Chatfield in the United States court on August 1, 1885, he insists that he fulfilled all the requirements of the law with respect to diligence, and that the defence of laches is not sustained. We think this position, however, is founded upon a somewhat strained interpretation of the contract in question. It provides that " in the event of the party of the first part," (Chatfield,) " prevailing and succeeding in certain legal proceedings about to be instituted and commenced by the party of the first part for the vesting of the legal title in the party of the first part, against persons who claim adversely to him an interest in the following-described property, . . . that the party of the first part, upon so acquiring the title legal and equitable to the said mine, by means of the legal proceedings so about to be commenced, doth hereby covenant and agree to and with the said party of the second part," (Johnston,) " to convey to the said party of the second part an undivided one-eighth interest in and to the said above-described lode, which shall be free and clear from all expense incidental to the litigation incident to said contemplated suit." A compliance with this contract on Chatfield's part evidently required the commencement within a reasonable time, and the diligent prosecution of, a suit for the establishment of his title to the property, since the question of adverse claims could not be determined by the mere application for a patent without the institution of a suit, or the compromise of these conflicting claims. That this was the construction put upon it by Chatfield himself is evident from the fact that, three days after this contract was made, he executed a quit-claim deed to Thomson and Sayre of an undivided one-eighth interest in the Johnston lode for a nominal consideration of $500. It is admitted, however, that no money consideration was paid for this conveyance, and Chatfield testifies that the actual consideration for this deed to Thomson

and Sayre was the legal services which they were to perform in and about the "legal proceedings" mentioned in the contract, and he further testifies that those services were never performed. This is all that Chatfield appears to have done at this time in the performance of his contract. Whether, if suit had been begun and prosecuted to a successful termination, a bill would have lain before the patent was issued it is not necessary to decide, since it is clear that the failure of Chatfield to institute legal proceedings within a reasonable time was a breach of his contract, and entitled plaintiff to treat it as at an end.

There were also significant facts occurring thereafter which should have put plaintiff upon inquiry, and stimulated him to activity in asserting his rights. As he was one of the original locators, both of the Smuggler No. 2 and the Johnston claims, he must have known that in any controversy between them, he would have been an important witness, and the very fact that he was not called upon indicated that the suit was not being prosecuted, and strengthened the inference, derivable from all the testimony, that the claim was not then considered of sufficient value to warrant the institution of a suit. That he was accessible as a witness is evident from his own testimony that he was in Thomson and Sayre's office in 1881, and was working at that time for Chatfield on a sub-contract. The incorporation of the Fulton Mining Company in 1880, and the conveyance by Chatfield, Crittenden and Adair of the entire property to the mining company by deeds put upon record, were wholly inconsistent with the spirit, if not with the letter, of the contract, and were circumstances calculated to arouse suspicion, since they divested Chatfield of his interest in the mine, disabled him from instituting legal proceedings in his own name, and put the ownership of the mine in the shape of capital stock, which was liable at any time to pass into the hands of purchasers who might be entirely ignorant of the plaintiff's interest. It is but just, however, to say in this connection that plaintiff seems to have been apprised of the fact that these parties were about to associate themselves together in forming a stock company, and that the advantages of such a

corporation were urged upon him, and in his first bill he averred that it was understood that the company would convey and transfer to him stock in such company to the amount of his interest in the lode, and that Chatfield would hold his interest in trust for the plaintiff until his title to the location had been established. If he assented to the formation of the corporation and to the transfer of the mine to it, he clearly waived his right to reclaim an interest in the mine itself. It is also a circumstance proper to be considered, as bearing upon the equities of this defence, that, at the time of the institution of this suit, a large proportion, if not a majority, of the stock in this company had passed into the hands of purchasers who had not been connected with the formation of the company, and were entirely ignorant of the Johnston-Chatfield contract.

In May, 1881, plaintiff went to the office of Thomson and Sayre, in Leadville, asked how the case was, and was informed that it was compromised. He then told them he would like to take the papers and copy them. They gave them to him. He took them and looked them over; went down to have them copied, but found it would cost too much, and did not have it done. These papers were the contracts between Chatfield and himself, Crittenden, Adair and himself, and the original grub-stake contract between Dunscomb, Seaver and himself. He must then have been informed of the fact that the contract of October 12, 1880, had not been recorded, although Thomson and Sayre promised him it should be. In 1882 it seems that he spoke to Chatfield, and said that he thought he ought to be entitled to his interest in the property; that they should have gone on and contested the case; to which Chatfield replied that they had found that there was "no shadow of a ghost to maintain his case." Even then he did not act.

It was not until April, 1885, more than a year after the Fulton Mining Company had obtained a patent to the property, that he made a formal demand upon Chatfield, and on August 1, 1885, filed his first bill in the Circuit Court of the United States to establish his title to a quarter interest in the lode. This suit does not seem to have been prosecuted with

much diligence, since it was allowed to linger for nearly a year, and was then dismissed, apparently, for a want of jurisdiction appearing upon the face of the bill. It has been frequently held that the mere institution of a suit does not of itself relieve a person from the charge of laches, and that if he fail in the diligent prosecution of the action, the consequences are the same as though no action had been begun. *Hawes* v. *Orr*, 10 Bush, 431; *Erhman* v. *Kendrick*, 1 Met. (Ky.) 146, 149; *Watson* v. *Wilson*, 2 Dana, 406; *Ferrier* v. *Buzick*, 6 Iowa, 258; *Bybee* v. *Summers*, 4 Oregon, 351, 361.

On the 19th of August, 1886, a second suit was brought in the state court, which, after some delay, caused in part by the death of the plaintiff's counsel, was dismissed because of a defective summons under the state practice.

While there is no direct or positive testimony that plaintiff had knowledge of what was taking place with respect to the title or development of the property, the circumstances were such as to put him upon inquiry; and the law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry. This principle was applied at the present term of this court in *Foster* v. *Mansfield &c. Railway*, 146 U. S. 88, to a case where a stockholder in a railway company sought to set aside a sale of the road which had taken place ten years before, when the facts upon which he relied to vacate the sale were of record and within easy reach. See also *Wood* v. *Carpenter*, 101 U. S. 135, 141; *Kennedy* v. *Green*, 3 Myl. & K. 699, 722; *Buckner* v. *Calcote*, 28 Mississippi, 432; *Cole* v. *McGlathry*, 9 Maine, 131; *McKown* v. *Whitmore*, 31 Maine, 448.

The duty of inquiry was all the more peremptory in this case from the fact that the property of itself was of uncertain character, and was liable, as is most mining property, to suddenly develop an enormous increase in value. This is actually what took place in this case. A property which, in October, 1880, plaintiff sold to Chatfield upon the basis of $4800 for

the whole mine is charged, in a bill filed October 21, 1887, to be worth $1,000,000, exclusive of its accumulated profits. Under such circumstances, where property has been developed by the courage and energy and at the expense of the defendants, courts will look with disfavor upon the claims of those who have lain idle while awaiting the results of this development, and will require not only clear proof of fraud, but prompt assertion of plaintiff's rights. *Felix* v. *Patrick,* 145 U. S. 317, 334; *Hoyt* v. *Latham,* 143 U. S. 553, 567; *Hammond* v. *Hopkins,* 143 U. S. 224; *Great West Mining Co.* v. *Woodmas Mining Co.,* 14 Colorado, 90.

The language of Mr. Justice Miller in *Twin Lick Oil Company* v. *Marbury,* 91 U. S. 587, 592, with regard to the fluctuating value of oil wells, is equally applicable to mining lodes: "Property worth thousands to-day is worth nothing to-morrow; and that which to-day would sell for a thousand dollars at its fair value, may, by the natural changes of a week, or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit."

We think it is clear that the plaintiff did not make use of that diligence which the circumstances of the case called for, and the decree of the court below dismissing his bill is, therefore,

*Affirmed.*