**ODETICS, INC., Plaintiff,**

v.

**STORAGE TECHNOLOGY CORPORATION, et al., Defendants.**

**No. 1:95CV881.**

United States District Court, E.D. Virginia.

March 22, 1996.

Paul J. Kennedy, Washington, DC, Vincent J. Belusko, William J. Robinson, Stuart L. Merkadeau, Eric Shih, Los Angeles, CA, for plaintiff.

Laurence E. Stein, Pennie & Edmonds, Washington, DC, John R. Stark, Bernard H. Chao, Pennie & Edmonds, Menlo Park, CA, Stephen J. Harbulak, Michael J. Lyons, Pennie & Edmonds, New York City, W. Russell Wayman, Storage Technology Corporation, Louisville, CO, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is a patent infringement action in which the parties filed cross-motions for summary judgment on the doctrine of laches. The accused infringers contend the undisputed record establishes that the plaintiff patentee knew or should have known of the existence of its infringement claim more than six years before suit was filed. They further contend that this delay in filing suit was inexcusable, and that they were prejudiced by it. The patentee, in response, denies these contentions, arguing instead that it had no reason to know of the existence of this cause of action until late 1993, and alternatively that any delay on its part in bringing suit was both excusable and nonprejudicial to the defendants. Thus, among the questions presented by the parties' cross-motions for summary judgment are the following:

(i) What knowledge must a patentee have about a putative infringing product or device to trigger the running of the laches clock?

(ii) Does a putative infringer's failure to obtain a detailed noninfringement opinion give rise to a negative inference sufficient to defeat the defendant's later claim of laches?

(iii) Is the defense of laches also available to "customer defendants," i.e., companies accused only of using an infringing product, as opposed to manufacturing and/or selling it?

### I.

■ The facts pertinent to the laches analysis are essentially undisputed and easily summarized.[1] Odetics, Inc. ("Odetics") filed this action on June 29, 1995, alleging that various automated tape libraries ("ATLs")[2]

---

1. A more complete recitation of the facts appears in a previous Memorandum Opinion in this case. *See Odetics, Inc. v. Storage Technology Corp.*, 906 F.Supp. 324 (E.D.Va.1995) (holding that second sentence of 35 U.S.C. § 102(g) is applicable to determine priority of invention in infringement suits as well as in interference proceedings).

2. Briefly, an ATL is a computer-controlled system for the storage and handling of data cassettes.

manufactured and sold by defendant Storage Technology Corporation ("Storagetek") infringed Odetics' United States Patent No. 4,779,151 (" '151 patent").[3] Crestar Bank, Visa International Service Association, Inc., and Visa USA, Inc. (collectively, "customer defendants") were also named as defendants because of their use of the accused Storagetek products, chiefly in connection with the ubiquitous automated teller machines that have revolutionized consumer banking over the past decade.

The '151 patent issued on October 18, 1988. By this time, Storagetek had already been producing and marketing its ATLs to the public for about a year. Indeed, Odetics became aware of the introduction of the ACS 4400, Storagetek's first ATL, in 1987. Thus, Timothy Crabtree, a co-inventor of the '151 patent, recalls seeing trade journal articles about the Storagetek ATL product circulated at Odetics sometime in 1987. In fact, Crabtree admitted that "the articles were circulated, because obviously this was somewhat similar technology to what we are working on, although in an entirely different industry." Specifically, Crabtree recalled thinking "Oh, someone else is doing something similar to what we are doing for a different purpose." Crabtree also knew at this time that the silos or library modules of the Storagetek ATL could be interconnected.

The trade journal articles circulated at Odetics were only part of Storagetek's marketing efforts in connection with the new ACS 4400. These efforts also included circulation of the original ACS 4400 system manual. This manual contains references to, and diagrams of, the system's pass-thru port, the '151 patent element on which Odetics' infringement claims focus. It also explicitly states that the pass-thru port rotates. Unlike the trade journal articles, however, it is unclear whether anyone at Odetics read the manual during this time period.[4]

Notwithstanding its knowledge of the Storagetek ATL, including that the ACS 4400 embodied "similar technology" to the '151 patent to accomplish a similar result, Odetics did not begin to investigate the possibility of infringement until late 1993. In November of that year, Storagetek approached Odetics regarding a potential sale of its subsidiary, Lago Systems, to Odetics. As a part of those sales discussions, Storagetek provided Odetics with documentation of Lago's ATL. Two months later, in January 1994, Odetics retained legal counsel to help assess the Storagetek products vis-a-vis the '151 patent, thereby taking the first legal steps on the road to the filing of this suit in June 1995.

## II.

▮ Laches is a seasoned, settled doctrine, firmly rooted in the foundational soils of equity and justice.[5] It is based on the

---

3. Specifically, the accused products are Storagetek's ACS 4400, Powderhorn, and WolfCreek ATLs. The latter two were not developed until the early 1990s, several years after the development of the ACS 4400. Because the Powderhorn and Wolfcreek are essentially identical to the ACS 4400 with respect to the elements at issue here, however, it is appropriate to treat all three ATL products as a single device, produced beginning in 1987, for purposes of the laches analysis. See MGA, Inc. v. Centri–Spray Corp., 699 F.Supp. 610 (E.D.Mich.1987) (holding that plaintiff's infringement claim against defendant's later-developed product would be barred by laches and estoppel found applicable to earlier product if subsequent product is equivalent to earlier one under doctrine of equivalents).

4. In his first sworn declaration, Odetics Vice President Bartholet stated that "any publicly available sales or product literature *obtained by Odetics* about [the first Storagetek ATLs] did not disclose sufficient information that would lead one to conclude that these products infringed

the '151 patent." This statement suggests that the manual was not in Odetics' possession, for as even Odetics concedes, the manual discloses sufficient information on the infringement issue. Yet, Odetics subsequently withdrew this statement from the record, leading Storagetek to urge that the withdrawal warranted an inference that Odetics, on further investigation, had discovered that it did in fact receive the manual in 1987 or 1988. Whatever the merits of this inference, it plays no role in the disposition of this matter.

5. *See, e.g., Halstead v. Grinnan,* 152 U.S. 412, 417, 14 S.Ct. 641, 643, 38 L.Ed. 495 (1894) (noting that laches is an equitable defense governed by equitable considerations); *Hoehn v. Crews,* 144 F.2d 665, 671 (10th Cir.1944), *aff'd sub. nom, Garber v. Crews,* 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870 (1945) ("Since laches is an equitable doctrine, its application is controlled by equitable considerations. It cannot be invoked to defeat justice and will be applied as a defense only where the enforcement of the as-

Latin maxim, *"vigilantibus non dormientibus aequitas subvenit,"* which means "equity aids the vigilant, not those who sleep on their rights."[6] The doctrine of laches may be applied to limit the judicial relief available to a plaintiff who waits an unreasonable amount of time before seeking such relief. Yet, the mere passage of time does not, by itself, warrant application of the doctrine. More is required, for as has been noted, "[l]aches is a species of estoppel,"[7] and the doctrine therefore requires both an act or omission by the plaintiff, namely failing to bring suit at an earlier date without reasonable excuse, and resulting prejudice to the defendant.[8] Thus, in the specific context of patent infringement litigation, a defendant attempting to interpose the affirmative defense of laches must show (i) an unreasonable and inexcusable delay by the plaintiff patentee in filing the infringement suit after the plaintiff knew, or reasonably should have known, of the defendant's allegedly infringing activity; and (ii) material prejudice to the defendant resulting from the delay. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1032 (Fed.Cir.1992) (*en banc*). Once these two elements are shown, a court may, in its discretion, invoke the equitable doctrine of laches to bar the patentee from recovering damages for any past infringement by that defendant.

■■■ From these basic principles, it is evident that the time from which the patentee's delay is to be measured is a crucial factor in the laches analysis. The period of delay begins when the plaintiff patentee knew or should have known of the alleged infringing activity. *Id.* at 1032. The "knew or should have known" standard means that a patentee need not know unequivocally that a device actually infringes before the laches

clock begins to run. *ABB Robotics, Inc. v. GMFanuc Robotics Corp.,* 828 F.Supp. 1386, 1391–92 (E.D.Wis.1993), *aff'd,* 52 F.3d 1062 (Fed.Cir.1995). Rather, he is charged with making the inquiry that a diligent and reasonably prudent patentee would make to determine whether another device infringes his patent. *Jamesbury v. Litton Industrial Products, Inc.,* 839 F.2d 1544, 1552 (Fed. Cir.), *cert. denied,* 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988). Put another way, "the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnston v. Standard Mining Co.,* 148 U.S. 360, 370, 13 S.Ct. 585, 589, 37 L.Ed. 480 (1893); *Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.,* 988 F.2d 1157, 1162 (Fed.Cir.1993) (quoting *Johnston* ).[9]

■■■ The next question, then, is what facts are sufficient to trigger the duty of inquiry. While case law on this point is meager, there are some decisions that provide a starting point for analysis of this case. For example, one court has found that knowledge of trade journal articles describing the allegedly infringing product is sufficient to satisfy the "knowledge" requirement of laches. *Hamilton v. Mid–West Abrasive Co.,* 216 F.Supp. 411, 419 (W.D.Pa.1963). More specifically, because the patentee in *Hamilton* had read these articles, he was "charged with knowledge that defendant had a successful machine which accomplished the same objects covered by his patent." *Id.* Similarly, another court of this division has held that a patentee's duty of inquiry is triggered by the commercial release of the allegedly infringing product coupled with the patentee's examina

---

serted right would work injustice."); *Des Moines Terminal Co. v. Des Moines Union Railway Co.,* 52 F.2d 616, 630 (8th Cir.1931) (stating laches is to be determined by considerations of justice).

6. *See Stone v. Williams,* 873 F.2d 620, 623 (2d Cir.1989).

7. *See Martin v. Consultants & Administrators, Inc.,* 966 F.2d 1078, 1100 (7th Cir.1992).

8. *See Kansas v. Colorado,* —— U.S. ——, ——, 115 S.Ct. 1733, 1742, 131 L.Ed.2d 759 (1995) (noting that laches requires proof of lack of diligence by

party against whom the defense is asserted and prejudice to party asserting defense); *see also White v. Daniel,* 909 F.2d 99, 102 (4th Cir.1990) (stating that laches analysis requires equitable balancing of plaintiff's delay with resulting prejudice to defendant).

9. Of course, the laches period cannot commence earlier than the issue date of the patent in suit. *Aukerman,* 960 F.2d at 1032.

tion of it. *See Jackson Jordan, Inc. v. Plasser American Corp.*, 219 U.S.P.Q. 922, 926 (E.D.Va.1983). From these decisions, a sensible guiding principle emerges: If a patentee knows of the existence of a product or device that (i) embodies technology similar to that for which he holds a patent and (ii) uses that similar technology to accomplish a similar objective, he has a duty to examine the product or device more closely to ascertain whether it infringes his patent. If he shirks this duty, he does so on peril of triggering the laches period and perhaps ultimately losing his right to recover damages for the infringement.

■ Once the laches period begins to run, a delay of more than six years before the commencement of a suit gives rise to a presumption as to both elements of laches, namely (i) that the delay was unreasonable, and (ii) that the defendant was thereby prejudiced. *See, e.g., Aukerman*, 960 F.2d at 1034–36; *see also Advanced Cardiovascular Systems, Inc. v. Scimed Life Systems, Inc.*, 988 F.2d 1157, 1163 (Fed.Cir.1993) (applying the six-year presumption to bar a claim challenging ownership of patent). Thus, where there is a six-year delay in asserting an infringement claim, a patentee seeking to avoid summary judgment must adduce evidence raising a genuine, material issue as to reasonableness or prejudice. *Aukerman*, 960 F.2d at 1037–38. If the patentee adduces such evidence, the presumption disappears, and the application of laches becomes once more a matter the accused infringer must prove by a preponderance of the evidence. *See Aukerman*, 960 F.2d at 1038. If, on the other hand, the patentee cannot adduce such evidence, the elements of laches will be presumed, and the trial court then has discretion to bar the patentee from re-

covering past damages for infringement. *See id.* In other words, a six-year delay shifts the burden to the patentee to rebut the presumption of laches. But where the delay is less than six years, no presumption operates, and the accused infringer relying on laches must demonstrate the existence of both elements of the doctrine, namely an inexcusable delay and resulting prejudice. *Aukerman*, 960 F.2d at 1034–37.

■ Not all delays in the assertion of a known infringement claim are fatal on laches grounds. In certain circumstances, a delay may be excused, even if the delay is six or more years. Whether circumstances exist to warrant excusing a delay must be determined on a case-by-case basis. Even so, certain general principles can be gleaned from the decided cases. Thus, an ongoing litigation involving the patent at issue can excuse a delay in filing an infringement action against a putative infringer.[10] In such cases, however, the patentee must give notice to the accused infringer, warning him that he might be subject to suit in the future, after resolution of the other litigation.[11] Indeed, some form of notice to a putative infringer—some signal that the patentee considers his rights to be infringed and intends to respond to the infringement—is typically, though not invariably,[12] required in connection with excusing a delay in initiating an infringement suit. For example, a patentee who gives notice of infringement to a suspected infringer may then delay suit until the extent of the infringement makes litigation financially feasible. *Tripp v. United States*, 186 Ct.Cl. 872, 406 F.2d 1066, 1071 (1968). A patentee may also excusably delay the onset of infringement litigation to negotiate with the accused infringer. *See Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1013–14

---

10. *See, e.g., Vaupel Textilmaschinen K.G. v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 877 (Fed.Cir.1991) (excusing portion of delay while patentee engaged in reissue proceedings); *Maloney–Crawford Tank Corp. v. Rocky Mountain Natural Gas Co., Inc.*, 494 F.2d 401, 402 (10th cir. 1974) (excusing delay attributable to litigation over patent ownership); *cf. Raber v. Pittway Corp.*, No. C 92–2581, 1994 WL 374542 (July 11, N.D.Cal.1994) (refusing to excuse delay due to dispute over title to patent in suit, where the dispute did not rise to level requiring litigation).

11. *See Vaupel*, 944 F.2d at 877; *Jamesbury*, 839 F.2d at 1553; *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573 (Fed.Cir.1987).

12. *See, e.g., Armstrong v. Motorola, Inc.*, 374 F.2d 764, 769 (7th Cir.) (excusing delay under wartime conditions without notice to infringers), *cert. denied*, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967).

(7th Cir.1970), *cert. denied*, 401 U.S. 956, 91 S.Ct. 978, 28 L.Ed.2d 240 (1971). Notice to an alleged infringer is the key to a finding of excusable delay, for notice allows the accused infringer to take steps to protect himself from liability—to change his product or his activities, for instance, or to institute a declaratory judgment suit himself against the patentee. *See Vaupel*, 944 F.2d at 877.

■■■■ Of course, unexcused delay is not, by itself, an occasion for the operation of laches. To obtain laches relief, the accused infringer must also show either evidentiary or economic prejudice. Evidentiary prejudice refers to the loss or destruction of evidence the accused infringer could have used in mounting his defense absent the delay. It arises when a delay renders the accused infringer unable to present "a full and fair defense on the merits," as, for example, when material witnesses die or the passage of time leaves memories unreliable. *Aukerman*, 960 F.2d at 1033. The focus is thus on the evidence available at the time the suit might have been brought, and on whether that evidence has become unavailable as a result of the delay.

■■■■ Similarly, the determination of economic prejudice focuses on financial investment or changes, undertaken by the accused infringer during the laches period, that resulted from the patentee's inaction. In this regard, it is important to distinguish between two species of economic prejudice: (i) prejudice that *results from* the patentee's delay in bringing suit, and (ii) prejudice that is not causally connected to the delay. The first species of economic prejudice, which must be shown by an accused infringer in the absence of the six-year presumption, typically arises where the accused infringer invests in the accused product during the delay period either without knowledge of the patent or without reason to believe the patentee would enforce the patent against the accused product. In other words, the accused infringer

need not show that he affirmatively relied on the fact that no infringement suit was pending against the accused product in making his investment; he need only show that the investment was a natural consequence of the passage of time. *See Meyers*, 974 F.2d at 1308 n. 1 (noting that accused infringer seeking to invoke laches need not show that he relied on delay).

■■■■ The latter species of economic prejudice, by contrast, is irrelevant to laches. This prejudice arises where it appears that the accused infringer would have invested in the accused product or otherwise changed his financial position even if suit had not been delayed. In this event, the accused infringer may not cry laches because the change in economic position did not result from the delay. *See Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed.Cir. 1992) (declining to find economic prejudice where accused infringer went ahead with planned investments despite implied notice of patentee's intent to enforce patent rights, as investments were therefore "simply a business decision to capitalize on a market opportunity"). Thus, where a patentee gives an accused infringer notice of infringement, any subsequent delay in bringing suit is unlikely to result in the type of economic prejudice that warrants application of the laches doctrine.

■■■■ Both laches elements, the reasonableness of the delay and the resulting prejudice to the defendant, play a further role in the laches analysis. The length of unexcused delay considered sufficient to invoke the laches doctrine varies according to the circumstances.[13] In determining whether a certain period of delay should bar a plaintiff from recovering damages for past infringement, courts balance the equities, including the length of the delay, the reasonableness of the plaintiff's excuses, and the seriousness of the prejudice to the defendant. *See Aukerman*,

---

**13.** *Galliher v. Cadwell*, 145 U.S. 368, 373, 12 S.Ct. 873, 875, 36 L.Ed. 738 (1892) (noting that doctrine of laches is fact specific); *Gasser Chair Co., Inc. v. Infanti Chair Manuf. Corp.*, 60 F.3d

770, 773 (Fed.Cir.1995) (finding that, as equitable matter, court is to look to all facts and circumstances and weigh equities of parties);

960 F.2d at 1034.[14] The ultimate question is then whether, under the circumstances as a whole, the "patentee dealt unfairly with the alleged infringer by not promptly bringing suit." *Id.* These general principles guide the laches analysis in the instant case.

### III.

The starting point in analysis of this case is to determine when the laches period began to run. Odetics contends that, while it knew of the existence of the Storagetek ATLs before 1988, it did not know that these ATLs included the element central to the current infringement claim, namely, the so-called "pass-thru port" that rotates to transport tapes between the separate silos or modules of the Storagetek product. Yet, the undisputed facts suggest that, at least as of the time the '151 patent issued in October 1988, Odetics should be charged with a duty to make reasonable inquiry about Storagetek's ATL system, which inquiry would have placed them on notice of the very features of the Storagetek products they now claim constitute infringement. Thus, Odetics was aware of both the introduction of the ACS 4400 (Storagetek's first ATL) in 1987 and some of Storagetek's marketing efforts in connection with that machine. A co-inventor of the '151 patent admittedly saw articles about the Storagetek ATL product circulated at Odetics around that time. In fact, the articles were circulated because Odetics' employees recognized that the ACS 4400 contained technology similar to that on which they were then working. Second, the co-inventor also knew that the silos or library modules of the Storagetek ATL could be interconnected. Third, Storagetek's sales literature included the original ACS 4400 system manual, which contained references to, and diagrams of, the system's pass-thru port. The manual also explicitly stated that the pass-thru port rotates. In sum, Odetics had actual knowledge of the ACS 4400 and knew it embodied technology similar to the '151 patent, and therefore had reason to investigate the matter further. A modest investigation would have produced the ACS 4400 system manual, which, in turn, would have revealed to Odetics the very facts and features central to its infringement suit, features that Odetics claims not to have discovered until late 1993.

Odetics seeks to avoid this conclusion by contending that despite its knowledge of the Storagetek ATL system, it had no reason to investigate the Storagetek product because Odetics was not involved in the computer data storage marketplace and did not compete directly with Storagetek. Given this, Odetics argues, there was no business reason to investigate Storagetek's ATLs. Yet, this lack of direct competition between Odetics and Storagetek is insufficient to excuse Odetics' failure to investigate the Storagetek product and, ultimately, its long delay in bringing suit. The standard governing investigation is one of "reasonable diligence" by a patentee. *Jamesbury,* 839 F.2d at 1552. The fact that the two companies operated in different markets does not alter the fact that Odetics actually knew of the existence of Storagetek's ATL and even recognized it as having a function similar to the system described and covered by its pending patent application. Such knowledge would have prompted a "reasonabl[y] diligen[t]" patentee to undertake an investigation to ensure that its patent was not being infringed. And this is so even if the suspected device was used in another market.[15] In the same manner, a reasonably diligent and prudent patent applicant would have undertaken an investigation to ensure that an admittedly similar invention would not interfere with the success of its application in the Patent and Trademark Office. In failing to research the precise

---

*Aukerman,* 960 F.2d at 1032 (same); *Jamesbury,* 839 F.2d at 1551 (same).

**14.** Evidence of knowing misconduct by the accused infringer is also relevant. *Aukerman,* 960 F.2d at 1034; *see infra* part V.

**15.** *See Jamesbury,* 839 F.2d at 1552; *see also Emhart Industries, Inc. v. Universal Instruments*

*Corp.,* 25 U.S.P.Q.2d 1295, 1298, 1992 WL 442248 (N.D.N.Y.1992) (finding that absence of commercial competition between defendant's initial product and plaintiff's product had "no bearing on whether defendant's [product] infringed, nor on whether, if the [product] infringed, plaintiff had actual or constructive knowledge that suit could have been brought much earlier").

operation of the Storagetek ATLs, Odetics failed to act as a reasonably diligent patentee should have acted, and it is therefore charged with the knowledge such research would have unearthed, namely the very facts on which it now relies in support of its infringement claims.

The meager case law on the duty of inquiry supports this conclusion. *Hamilton v. Mid–West Abrasive Co.* is factually similar to this case. There, as here, the patentee had read trade articles describing the product he later accused of infringing his patent. *See Hamilton*, 216 F.Supp. at 419. If Odetics did not discover Storagetek's pass-thru port until 1994 or 1995, it is because Odetics, like the patentee in *Hamilton*, was "blind to the information which was easily available to it," information it should have studied after learning of the existence of the Storagetek ATLs. *See id. Jackson Jordan, Inc. v. Plasser American Corp.* also has analogous facts. There, the court charged the patentee with the duty to investigate the accused product further after he had examined it and found it similar to the patented invention. *See Jackson Jordan*, 219 U.S.P.Q. at 926. Here, while Odetics apparently did not physically examine the accused ATLs, an inventor of the '151 patent read trade journal articles demonstrating the similarities in technology and function between the ACS 4400 and the device covered by the '151 patent. Moreover, the ACS 4400 sales material contained detailed diagrams of the Storagetek ATL, including the pass-thru port that is the linchpin of Odetics' infringement claim.

In sum, the information readily available to Odetics in 1987 and 1988 clearly disclosed the existence and operation of Storagetek's pass-thru port. Odetics knew about the Storagetek device, as well as its similarity to the pending '151 patent, and this knowledge triggered a duty to examine the available Storagetek information. Because Odetics' unreasonable failure to investigate the Storagetek ATL system at that time leads to its being charged with knowledge of the pass-thru port, Odetics either "knew or should have known" of the alleged infringing activity when its patent issued in 1988. *See Aukerman*, 960 F.2d at 1032.

More than six years passed between 1988 and the institution of this suit. Hence, a presumption arises that (i) the delay was unreasonable and inexcusable, and (ii) Storagetek thereby suffered the requisite prejudice. *See Aukerman*, 960 F.2d at 1037. To defeat this presumption, Odetics must point to evidence raising a triable issue of fact either as to whether its delay was reasonable and should be excused, or as to whether Storagetek was thereby prejudiced. This Odetics has failed to do. Neither its excuses for not filing suit until 1995 nor its assertions that Storagetek was not prejudiced by its procrastination are enough to raise a genuine, triable issue of material fact.

■ First, although Odetics has offered several reasons why its delay was reasonable and should be excused, none is persuasive. Odetics first claims that it had no reason to suspect that Storagetek's ATLs might infringe the '151 patent because the rotating pass-thru ports were hidden from sight. Yet, the sales materials for the ACS 4400 clearly show and describe this feature of the Storagetek product, and these materials were available to Odetics, as they were to the public in general, beginning in 1987. Moreover, the claim that Odetics did not know about the rotating pass-thru port is relevant to the issue of when to start the period of delay, not to whether the length of that period, once it began, was reasonable; indeed, Odetics advanced this same argument in support of its assertion that the laches period did not begin until late 1993.

Odetics next contends that its delay should be excused because it had neither a legal department nor formal patent enforcement procedures during the period of delay. As a matter of law, however, this fact does not excuse Odetics' failure to investigate the Storagetek ATLs until some six years after the alleged infringement commenced. *See Coleman v. Corning Glass Works*, 619 F.Supp. 950, 952 (W.D.N.Y.1985) (holding inability to locate attorney who would prosecute infringement suit inadequate as matter of law to excuse delay), *aff'd*, 818 F.2d 874 (Fed.Cir. 1987).

■ Further, Odetic asserts that it had no reason to investigate Storagetek's ATL system because the two companies were operating and selling their respective ATLs in different competitive markets.[16] This excuse has been sensibly rejected by the only case addressing it. *See Emhart Industries*, 25 U.S.P.Q.2d at 1298 (refusing to excuse patentee's lack of knowledge of infringement claim based on absence of commercial competition between patentee and accused infringer). To be sure, there may be circumstances where the fact that the infringing product is sold in a different market might excuse the patentee's delay in *discovering* the product and hence in bringing suit. But in no event does this fact justify excusing delay where, as here, the patentee already knew about the product, knew that it involved technology similar to the patented invention, and knew that it accomplished a similar result.

And finally, it is worth noting that Odetics' laches position is further impaired by its failure to give Storagetek timely notice that Storagetek ATLs potentially infringed the '151 patent. *See Vaupel*, 944 F.2d at 877 (stressing importance in laches analysis of notice to accused infringer). Because such notice would have allowed Storagetek to take some action to save itself from the potential liability it now faces, Odetics' silence is further support for the conclusion that its delay in bringing this suit cannot be justified.

■ Odetics' attempts to raise a factual dispute on the issue of prejudice also fail. To begin with, undisputed facts demonstrate that Storagetek has suffered evidentiary prejudice. For example, at least 600 to 800 documents related to Storagetek's § 102(g) validity defense[17] have been lost or destroyed as a consequence of the delay. In addition, it appears from the discovery record that key figures in the prosecution of the '151 patent no longer recall facts that might well have aided Storagetek in defending against Odetics' claims. Thus, Messrs. Fehrman and Hall, Odetics' patent counsel

responsible for prosecuting the '151 patent, no longer have any recollection regarding their representation of Odetics with respect to that patent, including the meaning or intent of the patent claims. At his deposition, Hall did not even remember having Odetics as a client.

■ Odetics does not dispute these facts. Rather, Odetics contends that Storagetek has not suffered prejudice because Storagetek has failed to identify what it can no longer prove. This contention is unpersuasive. To be sure, "[c]onclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient" to prove that the defendant suffered injury. *Meyers v. Asics Corp.*, 974 F.2d 1304, 1308 (Fed.Cir.1992). But that is not the case here. Storagetek has identified a category of important documents no longer available owing to the passage of time and a category of important testimony from specific witnesses also lost because of delay. In so doing, Storagetek has done the best it can do in the circumstances. To require more would set an insurmountably high standard for showing evidentiary prejudice. It is impossible for Storagetek to know precisely what facts these witnesses have forgotten due to the passage of time. By definition, a witness who has forgotten a certain category of information is aware of the category, but cannot recall the specifics within the category. One may know that a friend's telephone number has been forgotten, but, of course, not know the phone number. Thus, a party need not identify with precision what evidence it is now unable to offer in his defense in order to show evidentiary prejudice. Instead, the party need only show that it has been denied the opportunity to present "a full and fair defense." *Aukerman*, 960 F.2d at 1033. Storagetek has clearly met this standard; it has been denied the opportunity to explore a substantial amount of evidence, both testimo-

16. Odetics also advanced this argument in support of its contention that the laches period did not begin until late 1993.

17. According to Storagetek, these documents chronicled Storagetek employees' diligence in re-

ducing their invention to practice, which diligence is necessary for a successful defense of priority under 35 U.S.C. § 102(g). *See, e.g., Odetics*, 906 F.Supp. at 326.

nial and documentary, that is relevant to its defense of Odetics' infringement claim. In the absence of this evidence, Storagetek's opportunity to defend itself against the infringement claim is somewhat less than "full and fair." In any event, Storagetek is entitled to the benefit of a presumption of prejudice, and Odetics' contention that Storagetek cannot say with particularity what the witnesses have forgotten neither rebuts the presumption nor raises a triable issue of fact in this regard.

Quite apart from the evidentiary problems Storagetek now faces because of Odetics' delay, there is little doubt that Odetics has not rebutted the inference that Storagetek suffered economic prejudice. Storagetek has extensively changed its economic position since 1988. Specifically, the record reveals that Storagetek has made a substantial investment in the development, manufacturing, and marketing of its ATL systems, including expanding its product line with the addition of the Powderhorn and WolfCreek ATLs in the 1990s. This investment is reflected in the sales of the accused products, which have risen from just over $1 million in the last quarter of 1987 to almost $100 million for the first quarter of 1995. During the delay period, Storagetek also made a significant economic investment in developing a patent portfolio of at least five patents based on the allegedly infringing products. These large financial outlays by Storagetek during the delay period show that it would indeed be injured if forced to change or discontinue production of the accused products. And, as Odetics has not presented even a scintilla of evidence that Storagetek would have made these investments if it had been faced with an earlier infringement suit by Odetics, it appears that this prejudice resulted from Odetics' long delay in filing suit.[18] In sum, because Odetics has not come forward with facts sufficient to raise a question as to the reasonableness of its delay or Storagetek's resulting prejudice, the six-year presumption of laches remains in effect.

## IV.

Even were the presumption not applicable, however, application of the laches doctrine would still be appropriate in this case. A 1992 memorandum from the head of the Odetics ATL product group to its Vice President Bartholet stated: "STK [Storagetek] now offers a rotary load/unload bin on their ATL. We may have a patent issue to resolve there also, and it could create negotiating leverage/incentive to do midrange business." This document reflects Odetics' actual knowledge of potential infringement by Storagetek at least by April 1992, and the laches clock should therefore begin running no later than that date. *See Motorola, Inc. v. CBS, Inc.,* 672 F.Supp. 1033, 1035 (N.D.Ill. 1986) (interoffice memorandum recognizing existence of number of unnamed infringing companies sufficient to begin laches period).

Odetics claims that the infringement concern reflected in this memo referenced Storagetek's cartridge access port—essentially the door to the ATL—rather than its pass-thru port. This argument misses the point. Regardless of the specific concern, Odetics clearly had a duty at that point to take steps to protect its patent by investigating the Storagetek ATLs. While Odetics chose not to investigate, its apparent reason for doing so—namely, a strategic decision to use the possibility of infringement as "leverage"—is clearly insufficient to prevent the commencement of the laches period at least as of the date of the memorandum, if not years earlier.

The remaining question is whether this three-year delay worked a hardship on Storagetek so severe as to justify application of the laches doctrine. Odetics' inaction was inexcusable, apparently based only on its conclusion that the Storagetek ATLs were not in direct competition with its own products. Furthermore, Storagetek has clearly demonstrated prejudice from the delay, both evidentiary and economic, that is quite se-

18. *See supra* part III. To the contrary, Storagetek offered proof of its standard company policy of pursuing licenses when faced with potential problems or liability from patent infringement. Such evidence persuasively rebuts any concluso-

ry assertion by Odetics that Storagetek's investments represented "simply a business decision to capitalize on a market opportunity" at any cost and without regard for the consequences. *See Hemstreet,* 972 F.2d at 1294.

vere.[19]  Other courts in analogous circumstances have found a three-year delay sufficient to make out the defense of laches. *See, e.g., Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540, 1550 (Fed.Cir. 1984); *Wafer Shave, Inc. v. Gillette Co.,* 857 F.Supp. 112, 128–29 (D.Mass.1993).  In the same manner, given the legally insufficient nature of Odetics' proferred excuses and the resulting severe prejudice to Storagetek, the balance of equities here tips decisively in favor of the latter.  Accordingly, Odetics' delay in filing suit between April 1992 and June 1995 may constitute laches.

## V.

The conclusion that a delay may constitute laches does not end the matter. Application of the laches defense is neither mechanical nor automatic; laches is an equitable doctrine, committed to the sound discretion of the trial court.  Proper exercise of this discretion requires denial of laches relief where the party urging application of the doctrine is itself guilty of inequitable conduct. *See Aukerman,* 960 F.2d at 1033.  Wilful infringement, if shown, constitutes such inequitable conduct.  In this case, Odetics contends that Storagetek is not entitled to laches relief because Storagetek was a wilful infringer, that is, because Storagetek knew its ATLs infringed an Odetics patent and continued to produce and sell them anyway. This assertion is based on the fact that Storagetek received infringement opinions in the late 1980s vis-a-vis its ACS 4400 and the Odetics '151 patent.

To be sure, knowledge of another's patent imposes on one who makes or sells a like device the affirmative duty to exercise

due care to determine that he is not infringing the patent.  This duty "includes, *inter alia,* the duty to seek and obtain competent legal advice from counsel *before* the initiation of any possible infringing activity." *Underwater Devices v. Morrison–Knudsen Co.,* 717 F.2d 1380, 1389–90 (Fed.Cir.1983) (emphasis in original).

Equally certain is that a court may draw certain inferences from an infringement defendant's failure to introduce an exculpatory opinion of counsel at trial.  If that occurs, "a court must be free to infer that either no opinion was obtained or, if an opinion were obtained, it was contrary to the infringer's desire to initiate or continue its use of the patentee's invention." *Fromson v. Western Litho Plate and Supply Co.,* 853 F.2d 1568 (Fed.Cir.1988).  Here, Storagetek has announced that it does not intend to use or rely on an opinion of counsel with regard to infringement.  Odetics thus urges that the Court may draw an inference from that fact under the rule announced in *Fromson.*  Factual distinctions between this case and *Fromson,* however, render such an inference inappropriate here.

First, the second inference mentioned in *Fromson*—that the defendant received an earlier opinion that its products were infringing—is impermissible in this case.  The letters at issue here clearly do not reflect an attorney's opinion that the Storagetek ATL infringed the Odetics '151 patent.[20]  Odetics has pointed the Court to no authority for the proposition that the Court can draw an inference it clearly knows to be false.

The only other *Fromson* inference available is that Storagetek did not fulfill its

---

**19.** *See supra* Part III for a discussion of the nature of the evidentiary and economic prejudice Storagetek suffered as a result of Odetics' delay. Although that discussion occurred in the context of Odetics' attempt to rebut the presumption of prejudice raised by a six-year delay, the reasons and conclusions regarding prejudice set forth in that discussion are equally applicable in this context, where no presumption as to prejudice exists and the burden of showing prejudice is on Storagetek.

**20.** While asserting that Storagetek would not rely on these letters at trial to defend against the infringement claim, Storagetek's counsel none-

theless disclosed the contents of the letters.  The first opinion, which does not include consideration of Storagetek's pass-thru port, concludes that the four claims of the '151 patent are not literally infringed by the cartridge access port of Storagetek's ACS 4400.  The opinion reserves the question of the doctrine of equivalents.  The second opinion flatly and broadly concludes that the claims of the '151 patent are not applicable to the ACS 4400.  Because this opinion does not set forth a specific or detailed analysis, it is unclear whether the conclusion reached includes an analysis of the pass-thru port.

affirmative obligation to obtain an opinion with respect to infringement of the '151 patent. This inference, too, is illogical, given that Storagetek *did* obtain an opinion, in fact two of them, of noninfringement. Odetics argues that Storagetek did not obtain an opinion with regard to whether its *pass-thru port* (as opposed to the cartridge access port) infringed the '151 patent. Even giving Odetics the benefit of the doubt on this point, Storagetek's lack of specificity in requesting an infringement opinion is insufficient to sully Storagetek's hands and defeat the laches defense.

*Fromson*, closely examined, compels this conclusion. In *Fromson*, the court drew a negative inference as to wilful infringement from the fact that the defendant did not rely on advice of counsel at trial. Indeed, the defendant there refused to answer interrogatories asking whether it had even *obtained* an opinion as to infringement of the plaintiff's patent. There is a significant distinction between (i) inferring, in *Fromson* circumstances, that a defendant *already found guilty of infringing activity* wilfully engaged in that activity, and (ii) inferring from these circumstances—in particular, the fact that Storagetek did not specifically request an opinion about its pass-thru port—some fact that would defeat Storagetek's laches defense. Certainly, if Storagetek had obtained an opinion that its products infringed the '151 patent, but went on producing its ATLs anyway, its hands would be unclean and the laches claim would fail. It might even be proper to accuse Storagetek of having unclean hands had it completely failed in its duty to inquire as to whether its product infringed the Odetics patent. Here, however, Storagetek obtained from counsel an opinion of non-infringement with respect to its device as a whole. In this circumstance, the fact that Storagetek may not have specifically asked counsel to consider its pass-thru port vis-a-vis the '151 patent does not warrant a negative inference sufficient to establish unclean hands.

Odetics further asserts that the determination of wilfullness is an issue for the jury, and that therefore any determination of laches at this stage is premature. This argument is unsound. If this were correct, laches would be a dead-letter defense: in order to defeat it, a plaintiff could merely allege wilful infringement, in which event the trial court would be unable to rule on the laches question until the trier of fact had made a finding as to wilfulness. Odetics has pointed to no authority, nor has the Court discovered any, suggesting that a court must wait for trial on the issue of wilfulness to decide the laches question.[21]

## VI.

The final issue with respect to the application of laches in this case is whether Storagetek's customers are entitled to benefit from the defense. Odetics argues that the customer defendants should not be permitted to benefit from any laches defense Storagetek may have, as laches is a "personal defense." This argument ignores the indemnity arrangements Storagetek has with its customers, and the importance of this fact to the equitable purposes of laches. If the benefit of laches is not extended to Storagetek's customers, Odetics would be able to recover indirectly from Storagetek for infringement for which it is barred by laches from recovering from Storagetek directly. More specifically, if the customer defendants cannot rely on laches, Odetics can recover infringement damages from them that they in turn can recover from Storagetek on the basis of the indemnity arrangements. This inequitable result effectively circumvents the laches ruling and thus defeats the doctrine's equitable purposes. If Odetics' delay warrants barring recovery from Storagetek, then because of the indemnity arrangements, Odetics should be barred from recovering the same damages from Storagetek's customers.[22] Accordingly, the customer defendants

---

**21.** Instead, Odetics points to cases where a court declined to apply the equitable defense of laches because of egregious conduct by the party asserting laches that was *clearly shown* at that point, not merely alleged. *See, e.g., Fromson,* 853 F.2d 1568.

**22.** Of course, a different result might obtain if there was evidence of unclean hands on the part

are entitled to benefit from Storagetek's laches defense, and Odetics may recover no damages for the use of allegedly infringing ATLs the customer defendants purchased from Storagetek prior to the institution of this suit on June 29, 1995. Case law supports this result. *See, e.g., Van Alen v. Aluminum Co. of America,* 43 F.Supp. 833, 838 (S.D.N.Y.1942) ("As far as [the infringer's customer] is concerned, since it is but a customer of defendant, it is covered by the protection which laches affords the latter."); *Boyle Leather Goods Co. v. Feldman,* 30 F.Supp. 914, 915 (S.D.N.Y.1940) ("[A]n unreasonable delay [exists] which sustains the defense of laches raised by both defendants, for Feldman's co-defendant is but a customer of his.").

The cases on which Odetics relies in urging a result to the contrary are inapposite. *Pierce v. American Communications Co.,* 111 F.Supp. 181 (D.Mass.), *rev'd on other grounds,* 208 F.2d 763 (1st Cir.1953), did not involve, as does this case, the question whether a finding of laches in favor of an indemnitor should inure to the indemnitees. Instead, in *Pierce,* a patentee sued the lessee of an allegedly infringing product, but not the lessor who had manufactured and sold the product. The court held that the lessee was not entitled to laches; yet, there was also strong evidence suggesting that the same result would obtain in the case of the lessor, although that issue was not there presented. *See Pierce,* 111 F.Supp. at 188–90. In contrast, this Court has expressly concluded that Storagetek may rely on the defense.

*Salem Engineering Co. v. National Supply Co.,* 75 F.Supp. 993 (W.D.Pa.1948), is equally inapposite. Again, no indemnity relationship existed in *Salem Engineering.* Indeed, the court there declined to extend an intervenor's laches defense to the original defendant in a patent infringement suit precisely because there was no connection between those two parties. *See Salem Engineering Co.,* 75 F.Supp. at 1000. Here, by contrast, there is a strong connection, in the form of an indemnity arrangement, between Storagetek and the customer defendants.

■ Yet, the customer defendants seek to be immunized from more than just past damages; they claim that the laches defense can also be invoked to prevent Odetics from obtaining an injunction against future *use* of the allegedly infringing machines. This argument fails. As a starting point, it is well established that an injunction against future *sale* of an accused infringing device is not affected by a successful laches defense. *See, e.g., Aukerman,* 960 F.2d at 1041; *Leinoff v. Louis Milona & Sons, Inc.,* 726 F.2d 734, 741 (Fed.Cir.1984). In other words, a court's determination that an accused infringer is entitled to the laches defense only precludes the patentee from obtaining damages for infringement occurring before the suit was brought. In fact, a finding of laches does not completely close the door on damages, as it does not prevent the patentee from recovering damages for any infringement, including use, that may occur between the filing of the suit and the entry of a final verdict.[23]

■ Thus, it is clear that the effect of a finding of laches on the plaintiff's recovery is limited. Precisely where those limits lie, however, is not so clear. No authority discusses the effect of laches on the future use of units whose sale was insulated from liability. According to the customer defendants, however, the policy of discouraging undue delay that underlies the laches defense supports the application they suggest. While this policy is valid,[24] it is not so strong as to

---

of any customer. No such evidence exists in this record.

**23.** Just such a situation is presented here, as Storagetek has continued to produce, market, and sell the accused products since this suit was filed, and the customer defendants have continued to use the ATLs they purchased from Storagetek earlier. Despite the Court's ruling on laches, Odetics will have the opportunity at trial to recover damages for this alleged infringement.

**24.** *See, e.g., Illinois v. Kentucky,* 500 U.S. 380, 388, 111 S.Ct. 1877, 1883, 114 L.Ed.2d 420 (1991) (noting that policy behind laches doctrine disfavors untimely assertion of rights); *Mackall v. Casilear,* 137 U.S. 556, 566, 11 S.Ct. 178, 181, 34 L.Ed. 776 (1890) ("The doctrine of laches is based upon grounds of public policy, which require for the peace of society the discouragement of stale demands."); *S.E.R., Jobs for Progress, Inc., v. United States,* 759 F.2d 1, 5 (Fed.Cir. 1985) (same).

require the result the customer defendants urge here. Laches is, purely and fundamentally, a restrospective defense. *See Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed.Cir.1990) (noting that "defense of laches bars only retrospective relief"); *Hottel*, 833 F.2d at 1573. It is clear that even in the face of the Court's ruling on laches, Odetics can pursue an injunction barring *Storagetek* from using the ATLs in the future. *See, e.g., Aukerman*, 960 F.2d at 1041 (citing *Leinoff*, 726 F.2d 734). And nothing in this record suggests that Storagetek's customers should be treated differently from Storagetek in this regard. Moreover, there is no reason in law or policy why Odetics should be precluded from obtaining an injunction against the use of the products by the customer defendants merely because those products left Storagetek's hands before Odetics filed this suit.

In sum, whether Odetics' delay in filing suit against defendants is taken as six years or three, it was clearly unreasonable in the circumstances of this case. Because the delay is inexcusable, and because defendants suffered prejudice from it, this case is an appropriate one in which to apply the doctrine of laches. Odetics is therefore barred from recovering damages from any of these defendants for any infringement occurring before June 29, 1995.

An appropriate Order has already issued.

The Clerk is directed to send copies of this Memorandum Opinion to all counsel of record.