**ODETICS, INC., Plaintiff,**

v.

**STORAGE TECHNOLOGY CORP., et al., Defendants.**

No. CIV. A. 95–881–A.

United States District Court, E.D. Virginia, Alexandria Division.

June 5, 1998.

Richard A. Simpson, Ross, Dixon & Masback, LLP, Washington, DC, Vincent J. Belusko, Graham & James LLP, Los Angeles, CA, for Plaintiff.

Craig C. Reilly, Richards McGettigan Reilly & West, P.C., Alexandria, VA (Nanda K. Alapati, E. Bradley Gould, Pennie & Edmonds LLP, Washington, DC, Jon R. Stark, Mark R. Scadini, Pennie & Edmonds LLP, Palo Alto, CA, George C. Summerfield, Rader Fishman & Grauer PLLC, Bloomfield Hills, MI, Herbert F. Schwartz, Mark H. Bloomberg, Fish & Neave, New York, NY, of Counsel), for Storage Technology.

Craig C. Reilly, Richards McGettigan Reilly & West, PC, Alexandria, VA (Ron E. Shulman, Nina F. Locker, Roger J. Chin, Wilson Sonsini Goodrich & Rosati, PC, Palo Alto, CA, of Counsel), for Visa International.

Thomas J. Scott, Jr., Scott L. Robertson, Hunton & Williams, Washington, DC, for Crestar Bank.

## MEMORANDUM OPINION

ELLIS, District Judge.

Can a patentee who is guilty of laches and barred from recovering past infringement damages obtain an injunction prohibiting future use of infringing products manufactured and sold during the laches period?

This is the central remedies question presented in this case following a jury verdict of infringement. And surprisingly, the question appears to be one of first impression in the reported case law, notwithstanding the frequency with which one might reasonably expect it to arise.[1] Also presented are the questions whether an injunction should issue in any form and, if so, whether the injunction should be stayed pending appeal.

---

1. This question was raised in an earlier appeal in this case, but the Federal Circuit declined to address it, stating that to do so would be "ill advised" given the state of the then existing record. *See Odetics v. Storage Tech. Corp.*, 1997 WL 357598, at *6 (Fed.Cir. June 25, 1997).

## I

Plaintiff Odetics, Inc. is the owner of United States Letters Patent No. 4,779,151, issued on October 18, 1988. The '151 patent teaches a system for transporting cassette tapes from a storage library to a tape player. By way of example, the preferred embodiment contains an octagonal housing (often referred to as a silo) inside of which are seven columns of tapes and one column of tape drives, or tape players. Within this housing is a robotic arm that retrieves the tapes from their storage bins and places them into the tape drives. Claims 9 and 14 of the '151, the claims-in-suit, describe a "rotary means" that (i) allows a cassette to be loaded from outside the library, for example by a human operator, and (ii) then rotates to allow the cassette to be accessed by the robotic manipulator located inside the silo.

Storage Technology Corp. ("STK") manufactures and sells certain library systems that Odetics alleged infringed the '151 patent. STK's systems are used to store and play computer data tapes. The accused STK systems contain "pass-thru ports," devices that connect multiple libraries or silos to each other so that tapes can be passed from one silo to another. Specifically, the tapes are placed in the pass-thru port in one library, and the pass-thru port then translates and rotates to deliver the tape to a second, adjacent library. The pass-thru ports thus have the extra advantage of allowing a tape to be inserted into a tape player in another silo if, for example, all of the tape players in the silo in which the tape is housed are in use. In essence, then, the pass-thru port facilitates rapid access to the information stored on the tapes. STK's systems using the pass-thru ports have enjoyed considerable commercial success over the last decade, with numerous systems being sold to a wide range of customers, including defendants Visa International and Crestar Bank.[2]

On June 29, 1995, Odetics filed this patent infringement action seeking damages from the date the '151 patent issued to the present. The crux of Odetics's infringement allegation was that STK's pass-thru ports infringed the rotary means element of claims 9 and 14.[3] Early in the litigation, defendants filed a motion for summary judgment on the ground of laches, which was granted. Accordingly, Odetics was precluded from recovering damages for any infringement occurring before June 29, 1995, the date this action was filed. *See Odetics, Inc. v. Storage Technology Corp.*, 919 F.Supp. 911 (E.D.Va.1996).

Thereafter, the case was tried twice. The first jury found that STK's accused devices did not infringe the '151 patent. Odetics appealed this finding,[4] and the Federal Circuit vacated the jury's verdict on the ground that this Court's original claim construction was erroneous. *See Odetics*, 1997 WL 357598. Thus, the matter was tried to a second jury using the claim construction mandated in the Federal Circuit's opinion. This jury found infringement by STK, Visa, and Crestar, concluded that a 4% running royalty rate was reasonable, and awarded Odetics $70.6 million in damages for STK's manufacture and sale of the infringing products since June 29, 1995.[5] The jury further

---

2. STK's other customers include such companies as Citicorp and Bank of America, United and Delta Airlines, Kaiser Permanente and the Mayo Clinic, Aetna and Blue Cross/Blue Shield, the Federal Reserve and the Federal Bureau of Investigation, the U.S. Postal Service and Federal Express, AT & T and MCI, and Merrill Lynch and Depository Trust. STK has approximately 6800 pass-thru ports installed in library systems at approximately 1500 customer locations.

3. Although Odetics accused the entire STK system, the sole infringement dispute, as the Federal Circuit recognized, was whether STK's pass-thru port was the same as or equivalent to the rotary means described in the patent. Thus, almost all of the evidence at trial concerned a comparison of the rotary means element and the pass-thru port. *See Odetics*, 1997 WL 357598, at *6 ("We therefore remand for a consideration of whether STK's accused Pass–Thru Ports are the same as, or equivalent to, the [rotary means].")

4. Odetics elected not to appeal the adverse laches determination, while STK appealed only one aspect of that determination, namely the same remedies issue presented here, but not addressed by the Federal Circuit in the previous appeal. *See Odetics*, 1997 WL 357598, at *2 ("Odetics appeals the infringement rulings and STK cross-appeals the laches ruling.")

5. The parties stipulated that the sales of infringing products from June 29, 1995, until the trial

found that STK, but not Visa and Crestar, wilfully infringed the patent. It awarded no damages for Visa's and Crestar's use of the infringing devices.

Based on the jury's finding of infringement, Odetics seeks a permanent injunction against STK, Visa, and Crestar. Specifically, it seeks to bar STK from making, using, selling, maintaining, or repairing all infringing systems, whether purchased before or after the laches period, and to prohibit Visa and Crestar from using all infringing systems they have purchased, again whether before or after the laches period. Defendants have objected to the issuance of an injunction and have moved conditionally for a stay of the injunction, should one issue.[6]

The parties filed numerous briefs on various remedies issues, and oral argument was heard over two days. Thus, the issues are now ripe for disposition.

## II

■ Section 283 of Title 35 authorizes district courts to impose a permanent injunction upon a finding of infringement. Indeed, it is "the general rule that an injunction will issue when infringement has been adjudged, absent a sound reason for denying it." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1247 (Fed.Cir.1989). The issuance of an injunction following a verdict of infringement is not automatic, however; district courts must instead follow the traditional equitable principles that guide the decision whether to enjoin certain conduct. *See* 35 U.S.C. § 283 (stating that courts "may grant injunctions in accordance with the principles of equity"). Thus, district courts enjoy "considerable discretion in determining whether the facts of a

situation require it to issue an injunction." *Roche Prods., Inc. v. Bolar Pharm. Co.*, 733 F.2d 858, 865 (Fed.Cir.1984).[7] With these general principles as background, analysis turns next to the specific issues presented.

### A. Enjoining Visa and Crestar

#### 1. Infringing Systems Purchased After the Laches Period

■ The law is well settled that an injunction shall not issue with respect to any infringing product for whose infringement the patentee has been awarded full compensation. *See Union Tool Co. v. Wilson,* 259 U.S. 107, 113, 42 S.Ct. 427, 66 L.Ed. 848 (1922); *Stickle v. Heublein, Inc.,* 716 F.2d 1550, 1562–63 (Fed.Cir.1983). Once a patentee has received the compensation it sought for a defendant's infringement, there arises an implied license in law for those products subject to the damages award, and this license frees the infringer from the monopoly of the patent as to those products. Thus, a purchaser of an infringing device for which a damages award has been paid may use it to the extent it could lawfully have done so had the infringing manufacturer originally been licensed to make and sell the product in question. *See Stickle,* 716 F.2d at 1563; *Amstar Corp. v. Envirotech Corp.,* 823 F.2d 1538, 1549 (Fed.Cir.1987) ("Having been awarded full compensation for the making and using of existing infringing thickeners, therefore, Amstar is not entitled to enjoin their use.").

■ Visa bought thirty infringing systems from STK after the date the complaint was filed, which, as a result of the laches ruling, is the date the damages period began. The jury's verdict clearly reflects that Odetics has

---

totaled $1.765 billion, and the jury, on the evidence presented, chose to use a running royalty rate of 4%. Four percent of $1.765 billion is $70.6 million, the amount of damages awarded. Thus, the jury awarded royalty payments for all of the systems sold outside the laches period.

**6.** Both parties filed other posttrial motions as well, all of which have been resolved. STK filed a motion for judgment as a matter of law and an alternative motion for a new trial on the issue of infringement, and these motions were denied. *See* Order, *Odetics v. Storage Tech. Corp.,* 14

F.Supp.2d 807 (E.D.Va.1998). STK also filed a motion for a new trial on damages, or in the alternative for a remittitur, which was also denied. *See id.* Further, Odetics's motion for attorney's fees was denied, but its motion for prejudgment interest was granted. *See id.* Finally, Odetics's motion for enhanced damages remains under advisement. *See id.*

**7.** *See also id.* at 866 (asserting that "if Congress wants the federal courts to issue injunctions without regard to historic equity principles, it is going to have to say so in explicit and even shameless language").

been awarded full compensation for these thirty systems.[8] Once the jury required STK to pay damages for the sale of these thirty systems, there arose an implied license as to them. Accordingly, Odetics is not now entitled to an injunction prohibiting Visa's use of those infringing systems.[9]

### 2. *Infringing Systems Purchased During the Laches Period*

■ During the laches period, Visa purchased eleven infringing systems, and Crestar purchased three.[10] As to these systems, Visa and Crestar contend that no injunction should issue as a matter of equity, because Odetics has unclean hands by virtue of its laches conduct,[11] and, as a matter of policy under recent Federal Circuit precedent, because issuance of an injunction would effectively erase the laches penalty by allowing Odetics to recoup through an injunction what it lost through the application of laches. Odetics counters chiefly by arguing that the application of the laches defense serves only to cut off past damages, nothing more. These arguments merit close scrutiny, as the Federal Circuit has not yet squarely ad-

dressed whether a successful laches defense precludes a patentee from obtaining an injunction against future use of an infringing product manufactured and sold during the laches period.

The analysis of the arguments properly begins with *A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020 (Fed.Cir.1992) (en banc), and numerous other decisions in which the Federal Circuit has emphasized that laches looks only to the past, whereas estoppel, a separate and distinct equitable remedy, forecloses all relief, past and future.[12] As *Aukerman* states, "laches bars damages for a patent defendant's pre-filing infringement *but not for post-filing damages or injunctive relief* unless elements of estoppel are established." 960 F.2d at 1040 (emphasis added); *see also Leinoff v. Louis Milona & Sons, Inc.*, 726 F.2d 734, 741 (Fed.Cir.1984) ("Laches, if proven ... has ... no effect on an action for *post-filing* damages or an injunction. It simply bars the recovery of *all pre-filing* damages."), *cited with approval in Aukerman*, 960 F.2d at 1041, *overruled on other grounds by Aukerman*, 960 F.2d at 1038–39.[13] As the

8. In awarding damages against STK for its infringement, but awarding zero damages for the infringement by Visa and Crestar, the jury clearly found that the customer defendants' use of the infringing systems did not occasion a separate and independent harm to Odetics.

9. Odetics claims that because STK has not yet paid the judgment, no implied license has arisen, and thus Odetics has *not* been fully compensated for the systems Visa purchased after the complaint was filed. *See Union Tool*, 259 U.S. at 113–14, 42 S.Ct. 427 (stating that when there is no compensation, there is no implied license to use the infringing products). This objection is easily overcome by requiring STK to post a bond or provide some other satisfactory guarantee of payment. *See Amstar Corp.*, 823 F.2d at 1548 (holding that filing of corporate guarantee was sufficiently equivalent to compensation to warrant denial of injunction).

10. Crestar did not purchase any STK libraries after June 29, 1995.

11. *See Atari Games Corp. v. Nintendo of Amer., Inc.*, 975 F.2d 832, 846 (Fed.Cir.1992) (requiring proponent of equitable relief to "come to the court with 'clean hands'"); 35 U.S.C. § 283 (providing that issuance of an injunction in patent cases is subject to traditional equitable principles).

12. To prove estoppel, the alleged infringer must show that the patentee communicated something in a misleading way, by statement, conduct, or silence, and that the alleged infringer relied on that misrepresentation in continuing or expanding its infringing business. If estoppel is proved, all relief on the infringement claim is barred. *See Aukerman*, 960 F.2d at 1041.

13. *See also Aukerman*, 960 F.2d at 1040 (holding that "the dichotomy in the effect given to the defenses of laches and equitable estoppel in patent cases" should not be eliminated); 960 F.2d at 1041 ("[W]e will continue to hold, as a matter of policy, that laches bars relief on a patentee's claim only with respect to damages accrued prior to suit."); *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573 (Fed.Cir.1987) ("Laches bars only retrospective relief while estoppel entirely bars assertion of the patent claim."); *George J. Meyer Mfg. Co. v. Miller Mfg. Co.*, 24 F.2d 505, 507 (7th Cir.1928) ("We think, therefore, that there is justification in patent suits for withholding damages for infringements committed prior to the commencement of the suit when laches is established, notwithstanding injunctional relief be granted."), *quoted in Aukerman*, 960 F.2d at 1041; 6 Donald S. Chisum, *Chisum on Patents* § 19.05[2], at 19–398 to –399 (1998 ed .) ("When the infringer proves laches ... [t]he owner may still obtain an injunction and damages as to post-

Supreme Court has put it in the analogous context of trademark infringement: "So far as the act complained of is ... in progress, and lies in the future, the right to the intervention of equity is not generally lost by previous delay." *Menendez v. Holt,* 128 U.S. 514, 524, 9 S.Ct. 143, 32 L.Ed. 526 (1888) (affirming proposition that complainant who is guilty of laches does not lose its right to seek an injunction), *quoted in Aukerman,* 960 F.2d at 1040. The metaphor provided in *Menendez* over one hundred years ago aptly depicts the principles at work in these cases: "[U]pon an application to stay waste, relief will not be refused on the ground that, as the defendant had been allowed to cut down half of the trees upon the complainant's land, he had acquired by that negligence the right to cut down the remainder." 128 U.S. at 523, 9 S.Ct. 143. Thus here Odetics cannot be denied an injunction against STK for the future manufacture and sale of infringing systems simply because Odetics has already lost something in the past; only equitable estoppel would lead to that result.

Notwithstanding the uniformity of these decisions, the principles announced therein do not dispose of all the issues presented in the instant circumstances, for *Aukerman,* its predecessors, and progeny stand only for the proposition that laches does not foreclose an injunction barring the future *manufacture or sale* of the infringing products; the cases say nothing about enjoining future *use* of products that were manufactured and sold during the laches period.[14] Equity, by way of laches, has already determined that Odetics should not be able to recover damages for

any infringing products sold prior to the filing of the complaint. Thus, the question presented here, but not squarely addressed in the *Aukerman* line of authority, is whether laches bars not only retrospective recovery of damages, but also all remedies relating to future use of infringing products made and sold during the laches period.

The answer to this question, compelled by the purpose of a laches defense, is that a finding of laches must preclude a patentee from obtaining an injunction prohibiting the use of any infringing product that was manufactured and sold during the laches period. Were the answer otherwise then the purpose and effect of the laches remedy would be significantly undercut, if not wholly erased. The purpose of a laches defense is to punish dilatory patentees and in so doing to encourage all patentees to seek infringement remedies in a timely manner.[15] This purpose would be frustrated if dilatory patentees lost only past infringement damages for laches products, but could still obtain an injunction as to future use of these products. In this event, what the law takes away with one hand by virtue of laches, it would effectively give back, in whole or in part, with the other, by issuing an injunction against future use of laches products.

This is well illustrated by the instant facts. Because Odetics was unreasonably dilatory in bringing suit, the doctrine of laches operates to penalize Odetics by precluding it from recovering any damages for infringing STK systems manufactured and sold during the

filing infringements unless the infringer further establishes the elements of an equitable estoppel.").

**14.** Indeed, the Federal Circuit recognized in *Aukerman* that its holding on laches was limited to the facts presented in that case. *See* 960 F.2d at 1041 ("At least on the facts presented in this case, we have no reason to revisit this accepted principle [that laches applies only to past damages].").

**15.** Simple fairness underlies this purpose: When patentees are dilatory, putative infringers, unaware of their infringement, may reasonably continue and even expand their infringing activities, thereby increasing both the magnitude of their ultimate liability and their stake and investment in the infringing activity. In these circum-

stances, it is unfair to penalize the infringer, who, after all, is only acting reasonably during the laches period. By contrast, it is fair to penalize the patentee, who is either aware of the infringement and is deliberately delaying any notice of infringement, or is ignorant of the infringement by virtue of its failure to police the patent adequately. Of course, there may be no unfairness when the infringer is aware of the patent and the patentee can establish that the infringement is wilful. In this event, any laches by the patentee might be vitiated by the infringer's wilful infringement, although it is equally true that an infringer's good faith belief in a defense to the allegation of infringement may tilt the matter in the infringer's favor. *See Aukerman,* 960 F.2d at 1033, 1038.

laches period. If Odetics were now to obtain an injunction precluding future use of these systems, it might well be able to use the leverage of this injunction to recoup from users of the laches systems who wished to continue using those systems all, a substantial portion of, or more than the damages lost by virtue of laches.[16] Indeed, Odetics's counsel's statements during oral argument suggest that this is precisely what Odetics would attempt to do.[17] Whether Odetics would succeed in this regard is unclear on this record and depends, *inter alia*, on how valuable the laches systems are to Visa and Crestar and how difficult and expensive it would be for them to convert to other, noninfringing systems.[18] But to whatever extent Odetics were to succeed in this regard, the laches penalty would be reduced or erased, thereby undermining the purpose of laches.[19]

Put another way, if infringers could be enjoined after they had successfully invoked laches, they would face an initial Hobson's choice: either (i) successfully argue laches, thereby escaping payment for past damages, but becoming subject to a future-use injunction that would likely be more expensive to buy off than any potential damages award; or (ii) forego the laches defense and pay damages for stale claims, but thereby acquire an implied license for future use of laches products. To accept Odetics's argument, then, would amount either to penalizing defendants for a meritorious defense or to allowing plaintiffs to recover in the face of their own inequitable conduct. Neither result is either sensible or appropriate. Therefore, it is clear that a patentee is not entitled to an injunction prohibiting the future use of infringing products purchased during the laches period.[20]

Compelled by sensible policy considerations, this conclusion also finds support in analogous Federal Circuit case law, specifically *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543 (Fed.Cir.1997). *Fonar* involved a patented technique for using MRI scanners. The patentee accused GE and South Shore Imaging Associates, a user of GE MRI equipment, of infringing Fonar's '966 patent. Fonar won a jury verdict finding GE liable for direct infringement and inducement of infringement, the latter based on GE's repair of certain scanners that infringed the patented invention. GE moved for judgment as a matter of law on the inducement finding, and the district court granted GE's motion. In affirming that ruling, the Federal Circuit

---

**16.** This point merits elaboration. The damages lost by virtue of laches is measured by multiplying the price of each infringing system made and sold during the laches period by the 4% royalty rate found reasonable by the jury. For each system, this would be a one-time payment representing reasonable infringement damages and allowing for the use of the system, both during the laches period and thereafter for the life of the system. One might argue that laches should result in no more than the loss of the value of using the infringing system during the laches period. Yet, this argument fails for the jury did not apportion use infringement damages between the laches and post-laches periods; it was not asked to do so, nor would such a calculation be possible on this record, or indeed practical on any record. In sum, the one-time 4% royalty payment for a system made and sold during the laches period is complete compensation for use of that system throughout its life, during the laches period and thereafter. It is this one-time payment in its entirety that Odetics loses owing to the operation of laches. And were Odetics, armed with an injunction against future use, thereby able to recoup any portion of this amount from Visa and Crestar, the power of the laches doctrine to accomplish its purpose would, to that extent, be undermined.

**17.** *See* Transcript at 92–93 (May 4, 1998).

**18.** In this regard, it is worth noting that STK has promised its customers a noninfringing design-around that will be available within the next year, and Visa has represented that it could convert its operations from infringing to noninfringing systems in five and a half months.

**19.** Indeed, in some instances, it is conceivable that a rational patentee might even choose to incur an adverse laches ruling, believing that infringers would become so dependent on the use of infringing products that they would be willing to pay a large premium over a reasonable royalty to avoid the injunction against future use.

**20.** Even so, the laches defense remains retrospective in that it applies only to *past* infringing systems, that is, to those systems that were manufactured and sold before notice of infringement was given. Thus, the holding reached here preserves the settled distinction between laches and equitable estoppel. *See, e.g., Aukerman*, 960 F.2d at 1040.

noted that Fonar had failed to mark the devices that were the subject of the inducement claim, from which it followed that, pursuant to 35 U.S.C. § 287, Fonar was barred from recovering past damages as to those machines. *See* 107 F.3d at 1555. Significantly, the Federal Circuit further held that "[i]f a machine was sold under circumstances that did not subject its seller to damages, then subsequent repair cannot subject it to damages." *Id.* In other words, the patentee's failure to mark its product precluded not just recovery for past infringement damages, but also an injunction against future repair of products made, sold, and used during the period when there was no marking.

*Fonar*, while not controlling, is instructive by analogy. Thus, the marking provision of § 287 operative in *Fonar* is analogous to the doctrine of laches at issue here, inasmuch as both bar past damages relief owing to the absence of proper notice. And *Fonar* stands

for the proposition that any product sold prior to the time proper notice is given to the alleged infringer cannot be the subject of any remedy, whether legal or equitable. *See Fonar*, 107 F.3d at 1555 ("One is entitled to repair that which is sold free of liability for infringement."). Accordingly, Odetics's delay in giving notice of infringement prevents it from seeking injunctive relief, either as to Visa's and Crestar's use, or as to STK's service and repair, with respect to any infringing systems sold prior to June 29, 1995, because those systems were "sold free of liability for infringement." [21]

The district court's order in *Fonar* also supports this conclusion. Specifically, the *Fonar* district court enjoined GE and South Shore from using any MRI scanners that infringed the '966 patent, but expressly excluded from the scope of the injunction "any MRI scanner delivered by GE before [the date of the verdict]." *Fonar Corp. v. Gener-*

---

**21.** Although *Fonar* specifically discusses the availability of damages for the repair of infringing devices, it applies equally to the issuance of an injunction prohibiting future use of infringing devices. In this regard, *Fonar* upheld the district court's grant of judgment as a matter of law on the issue of inducement of infringement. Thus, regardless of the nature of the relief Fonar sought, the case specifically holds that there can be no infringement liability or remedy with respect to products that were made, sold, or used prior to the giving of notice by marking. *See Fonar*, 107 F.3d at 1555 (holding that when there is no direct infringement, there can be no inducement of infringement through service and repair); *cf. Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 484, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) ("Where use infringes, repair does also, for it perpetuates the infringing use."). Of course, any continued service by STK must be limited to routine maintenance and repair, and may not extend to work that can be characterized as "reconstruction." *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961) (holding that licensed products can be repaired and maintained provided that there is no reconstruction). ●

Odetics argues that even if there is no injunction as to Visa and Crestar, STK, which was found to have wilfully infringed the '151 patent, should nonetheless be enjoined from servicing and repairing the pre-complaint systems. Odetics bases this argument on the principle that "a patentee may be able to preclude application of the laches defense with proof that the accused infringer was itself guilty of misdeeds towards the patentee." *Aukerman*, 960 F.2d at 1038 (citing the maxim, "He who seeks equity must do

equity"). In particular, a defendant who is found to have wilfully infringed a patent may be foreclosed from invoking the laches defense. *See Odetics*, 919 F.Supp. at 924 ("Wilful infringement, if shown, constitutes such inequitable conduct."). *But see Aukerman*, 960 F.2d at 1033 (noting that "a good faith belief in the merits of a defense may tilt the matter in [the defendant's] favor" on this issue). However, even if STK is not entitled to rely on the laches defense, Visa and Crestar are so entitled, and as a result, their use of the fourteen pre-complaint systems does not constitute direct infringement. And *Fonar* explicitly holds that repair and service of products purchased prior to the notice date, that is, products that do not directly infringe, does not constitute inducement of infringement. *See* 107 F.3d at 1555. Thus, there is no basis on which to enjoin STK from servicing and repairing these systems.

Yet, this does not end the analysis of the effect of the jury's finding that STK wilfully infringed the '151 patent. The principle that "a patentee may be able to preclude application of the laches defense with proof that the accused infringer was itself guilty of misdeeds towards the patentee" may provide a basis for reopening and expanding the damages period available to Odetics to include those systems sold prior to June 29, 1995. A separate Order sets forth a briefing schedule for argument on this issue. Of course, if Odetics is allowed to recover for infringing systems made and sold during the laches period by virtue of STK's wilful infringement, then the issue of enjoining STK, Visa, and Crestar would be rendered moot, as an implied license would arise with respect to these systems. *See Stickle*, 716 F.2d at 1562–63.

*al Elec. Co.*, 902 F.Supp. 330, 354 (E.D.N.Y. 1995). Thus, those products for which Fonar received compensation were excluded from the injunction. And this was appropriate, as GE and South Shore received implied licenses for those devices once the judgment was satisfied. But the order also excluded from the scope of the injunction any devices made, used, and sold prior to the time notice was given, namely those devices for which GE and South Shore received no implied license. This ruling was not disturbed on appeal. The district court's denial of injunctive relief even as to the products for which the patentee received no compensation is consistent with the result reached here, as it avoided giving to the patentee through an injunction what it had lost through its failure to comply with the statutory marking requirement.[22]

It is worth repeating that the instant holding does not lead to the conclusion that the marking statute and laches preclude not only past damages, but also *all* future injunctive relief—a result that would plainly be at odds with the language of the marking statute and Federal Circuit precedent. *See* 35 U.S.C. § 287(a) (providing that in the event of a failure to mark or otherwise give notice of a claim for infringement, "no damages shall be recovered by the patentee," but not limiting right to injunctive relief); *Aukerman*, 960 F.2d at 1040 (holding that laches does not bar injunctive relief). The holding reached here bars only injunctive relief against use of systems manufactured and sold prior to the time notice was given, and thus it still allows for injunctive relief, consistent with the authorities cited, against future manufacture and sale of infringing systems by the manufacturer of those systems. Thus, the principles discussed in this section point persuasively to the conclusion that the finding of laches precludes the issuance of an injunction against the use, maintenance, and repair of

---

22. Finally, defendants also rely on *Starobin v. United States*, 229 Ct.Cl. 67, 662 F.2d 747 (1981), in which the Court of Claims held that a successful statute of limitations defense precluded Starobin, the patentee, from obtaining future recovery. Starobin alleged that the government had procured six vehicles that infringed his valid patents. The government moved for partial summary judgment, arguing that Starobin was not entitled to any relief on the vehicles because the six-year limitations period had run. The Court of Claims held that an accused product that is first used more than six years before the filing of a complaint cannot provide the basis for any compensation sought by the patentee, even if the product was subsequently used within the limitations period. *See Starobin*, 662 F.2d at 749. By analogy, then, defendants here argue that once it was determined that Odetics was precluded by laches from recovering damages for any infringing systems purchased prior to the filing of the complaint, it was similarly precluded from seeking an injunction barring the future use of those same systems.

Defendants' argument is flawed, and *Starobin*, unlike *Fonar*, is not apposite, for at least three reasons. First, Starobin was suing the government, not a private defendant, and it has long been settled that injunctions cannot issue against the government. *See* 28 U.S.C. § 1498(a). Accordingly, any discussion in *Starobin* about the extent of available relief is arguably limited to the right to recover damages; the decision says nothing about the issuance of injunctions. Second, unlike infringement by a private defendant, which is a continuing tort, *see Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1221 (Fed. Cir.1995), infringement by the government is more akin to a taking, *see Pitcairn v. United States*, 212 Ct.Cl. 168, 547 F.2d 1106, 1114 (1976). And in this regard, it only makes sense that a patentee should be able to recover solely for the first taking of his property, and not for any subsequent use. Once the property is taken by the government with respect to any one product, it cannot be taken again. Thus, a patentee in that context is entitled to recovery only at the time the taking first occurs. *See Pitcairn*, 547 F.2d at 1115 (holding that a taking with respect to any particular accused device occurs when the device is first used or procured by the government), *cited in Starobin*, 662 F.2d at 749; *Starobin*, 662 F.2d at 749 (holding that "for each particular device only one right to recovery can arise, and that right must occur upon the first manufacture or use by or for the government of that specific device"). By contrast, a patentee suing a private defendant surely can recover for continuing infringement that occurs during the period immediately prior to suit that is part of the damages window; indeed, that is exactly what happened in this case with respect to STK. Finally, *Starobin* is distinguishable because the holding there was premised partly on policy concerns about stale claims and "their attendant problems stemming from destroyed records, dulled memories, and unlocatable witnesses." 662 F.2d at 750. That is, the Court of Claims worried that a damages award in that case could not be fixed with any degree of confidence. Yet when, as here, a patentee seeks an injunction and not an accounting, no such proof problems present themselves, and therefore this policy underlying *Starobin* has no bearing on the relief Odetics seeks. *Starobin*, in short, is of no avail to defendants.

any machine for which no damages were recoverable as a result of Odetics's delay in filing the complaint. That dilatory conduct has, in the language of *Fonar*, freed those systems from future liability for infringement.[23]

## B. *Enjoining STK*

▋ The ruling with respect to laches does not dispose of the injunction question altogether, for there remains the question whether and to what extent STK should be enjoined for its future manufacture, use, and sale of the infringing library systems, and for its future service and repair of infringing systems owned by customers other than Visa and Crestar. Issuance of injunctive relief against STK is governed by traditional equitable principles, which require consideration of (i) whether the plaintiff would face irreparable injury if the injunction did not issue, (ii) whether the plaintiff has an adequate remedy at law, (iii) whether granting the injunction is in the public interest, and (iv) whether the balance of hardships tips in the plaintiff's favor. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

### 1. *Irreparable Harm*

When, as here, "validity and continuing infringement have been clearly established ... immediate irreparable harm is presumed." *Smith Int'l Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983) (footnote omitted). There are several reasons, say defendants, not to indulge that presumption here.

● First, defendants note that Odetics waited almost seven years after infringement began to commence this action, and when it did so, it did not seek a preliminary injunction. This point, by itself, would suggest that the continued manufacture and sale of the infringing systems does not constitute irreparable harm. *Cf. High Tech Med. Instr., Inc. v. New Image In-*

*dus., Inc.*, 49 F.3d 1551, 1557 (Fed.Cir. 1995) ("This court has recognized that delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."); *T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed.Cir.1987) (holding that patentee's delay in seeking preliminary injunction was "incompatible with the emphasis on the right to exclude that is the basis for the presumption [of irreparable harm] in a proper case").

● Second, defendants contend that given that Odetics no longer practices the '151, it will not be irreparably injured if the pass-thru ports continue to be available in the marketplace. *See High Tech*, 49 F.3d at 1556 (observing that "the lack of commercial activity by the patentee is a significant factor in the calculus" of whether the patentee will suffer irreparable harm in the absence of an injunction). Indeed, say defendants, Odetics will benefit if STK is allowed to continue practicing the '151 because future sales will entitle Odetics to future royalty payments.

● Third, defendants note that Odetics has licensed the '151 to two other entities. Defendants suggest that this fact cuts against Odetics's assertion that it has retained monopoly power and that denial of an injunction would threaten that power. *See High Tech*, 49 F.3d at 1557 (stating that grant of licenses to others suggests that injury is monetarily compensable); *Dynamic Mfg. Inc. v. Craze*, No. 97–1165, 1998 WL 241201, 1998 U.S. Dist. LEXIS 45300, at *11 (E.D.Va. Feb. 23, 1998) (noting that voluntary relinquishment of monopoly power "cuts against any allegation of irreparable harm").

None of these points is persuasive, individually or collectively, in the context of this case. They ignore entirely the paramount right of a patentee to exclude whomever it wishes from practicing the claimed invention.

---

**23.** In an earlier memorandum opinion in this matter, the Court held that, *on the record then presented*, Odetics should not be precluded from obtaining an injunction against the use of the infringing systems by Visa and Crestar merely because those products were purchased prior to the time the complaint was filed. *See Odetics*, 919 F.Supp. at 926–27. Now that the record is complete and this issue has been briefed and argued orally in significantly greater detail, it is evident that Odetics should be so precluded.

*See* 35 U.S.C. § 154 (granting patentees the right to exclude others from making, using, or selling the patented invention). First, simply because Odetics did not seek redress for its injury at the first available opportunity does not necessarily mean that such injury will not continue in the future and that it will not be irreparable. Second, defendants are incorrect that absent an injunction Odetics will not suffer irreparable harm simply because it will be paid royalties for all future infringement. If no injunction issues, Odetics effectively will be forced to license the '151 patent to STK, a result antithetical to a basic tenet of the patent system, namely that the decision whether to license is one that should be left to the patentee. Third, the existence of two licenses to practice the '151 patent does not mean that Odetics has given up all control over who may practice the rights granted exclusively to it by the patent.

In sum, were an injunction not to issue Odetics would suffer significant irreparable harm, namely the loss of its statutory right to license or not to license its patent to whomever it wishes.

### 2. *Adequacy of Legal Remedy*

Defendants contend that Odetics has an adequate remedy at law, i.e., money damages, and thus that equitable relief is unnecessary. Settled Federal Circuit precedent refutes this contention:

> [A]rguments that infringement and related damages are fully compensible [sic] in money downplay the nature of the statutory right to exclude others from making,

using, or selling the patented invention throughout the United States. While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the sole remedy against future infringement.

*Atlas Powder Co. v. Ireco Chem.*, 773 F.2d 1230, 1233 (Fed.Cir.1985) (citations omitted). Odetics's legal remedy, according to defendants, would consist of future royalty payments on the manufacture, sale, use, and service of infringing systems made or sold subsequent to the jury's verdict. Although such damages might be "adequate" in the sense that they could replicate what might be a reasonable royalty for such continued infringement, damages, however measured, are nonetheless inadequate because limiting Odetics to damages does not allow it to exercise the monopoly power granted to it by the statute; an injunction is the only remedy that can achieve that goal.

### 3. *Public Interest*

The public-interest factor often favors the patentee, given the public's interest in maintaining the integrity of the patent system.[24] In certain instances, however, it is not in the public interest to issue an injunction against an infringer.[25] Defendants assert that this is one of those instances.[26] They are mistaken.

To begin with, most of defendants' arguments about the public interest assume that an injunction will issue with respect to Visa's and Crestar's continued use of the systems they have already purchased. In this regard, Visa asserts that over 500 million cardholders, who purchased over $1 trillion in

---

**24.** *See Eli Lilly & Co. v. Medtronic*, 7 U.S.P.Q.2d 1439, 1445 (E.D.Pa.1988) (finding that Congress has determined that the public interest favors granting exclusive licenses to patentees over encouraging free competition between inventors and otherwise infringers, even as to such lifesaving devices as heart defibrillators), *rev'd on other grounds*, 872 F.2d 402 (Fed.Cir.1989); *cf. Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 991 (Fed.Cir.1993) (holding that district court abused its discretion in failing to consider public interest in enjoining infringement).

**25.** *See, e.g., Datascope Corp. v. Kontron Inc.*, 786 F.2d 398, 401 (Fed.Cir.1986) (holding that district court did not abuse its discretion in denying preliminary injunction, in part based on public

interest, because the infringing product involved was a catheter preferred by many physicians in the treatment of heart patients); *Roche Prods.*, 733 F.2d at 865 (remanding case to district court to determine if enjoining infringement of patent for sleeping pill was in public interest); *Marine Transp. Lines, Inc. v. Lehman*, 623 F.Supp. 330, 335 (D.D.C.1985) (noting that court may withhold injunction to serve public interest, even if doing so would burden petitioner).

**26.** Although Visa and Crestar are not subject to any injunction that does issue, those customers' arguments are nonetheless relevant to the public-interest analysis, and thus are considered here along with STK's arguments.

goods and services last year using Visa credit cards, unknowingly depend on Visa's operation of STK library systems and its consequent ability to access records in an efficient manner.[27] Similarly, Crestar avers that it depends on the STK products to process all of its customers' transactions, including deposits, withdrawals, electronic payments, and wire transfers. Given this, defendants argue that if Visa and Crestar were enjoined from using these systems, and if STK were enjoined from servicing, repairing, and maintaining the systems in use at Visa and Crestar, the public would suffer considerably. Indeed, defendants' suggested parade of horribles is not unimpressive: various routine financial transactions would be disrupted and delayed; consumers would be denied access to their funds or would have checks bounce; and time-sensitive payments such as mortgage and tax payments might not be made on time.[28] Yet, this argument and supporting parade of horribles is ultimately irrelevant, given that Visa's and Crestar's continued use and STK's continued service of the pre-complaint and post-complaint systems will *not* be enjoined. Thus, defendants' claims about the public interest are, in this regard, meritless.

Defendants next address the public interest as it relates to STK's service and repair of those systems used by STK's customers other than Visa and Crestar. The first question that must be resolved is whether an injunction could even issue with respect to repair of these systems. The plain answer is that it could not. As *Fonar* teaches, STK could be enjoined from repairing these systems only if the customers' use of them constituted direct infringement. *See Fonar,* 107 F.3d at 1555. As to systems purchased by these other customers prior to June 29, 1995, there likely could be no direct infringement, as the laches finding would preclude Odetics from obtaining any relief with respect to those systems.[29] Systems purchased by these customers after June 29, 1995, stand on a different, indeed stronger footing: they were included in the jury's verdict. That verdict was calculated using the royalty base to which the parties stipulated and that included sales of *all* infringing systems sold after the date the complaint was filed. Accordingly, as to these post-complaint systems, an implied license in law has arisen by virtue of the jury's verdict. *See Stickle,* 716 F.2d at 1562–63. Thus, these systems cannot directly infringe, and accordingly repair of them cannot amount to inducement of infringement or contributory infringement.

In sum, all of defendants' arguments regarding the public interest are unconvincing, and this factor accordingly weighs in favor of the issuance of an injunction prohibiting STK from making, using, or selling infringing systems in the future.

### 4. *Hardship to the Parties*

STK contends that an injunction would have crippling effects on its business. This

---

**27.** Visa states that if it were required to take the infringing systems out of service, it would be forced to resort to using "runners," individuals who would retrieve each data tape manually once it is requested and then insert it manually into the proper tape drive. Odetics's suggestion that the availability of this alternative system diminishes defendants' claims of injury to the public is hardly convincing. Nothing either in this record or in common experience suggests that the use of runners would be comparable in speed and accuracy to the performance of an automated system such as the infringing STK system.

**28.** It should be noted, however, that Visa's and Crestar's assertions of the integral and valuable role the infringing systems play in their quotidian operations are undercut to an extent by their characterization at trial of the '151 patent as a trivial invention with little worth to the robotics industry. *Cf. Moxness Prods., Inc. v. Xomed, Inc.,* 7 U.S.P.Q.2d 1877, 1879 (M.D.Fla.1988) (holding that party moving for stay "should not now be permitted to disavow its claims at trial to argue here that the loss of the [patented device] from its product line would produce irreparable harm"); *accord Hoechst Celanese Corp. v. BP Chem. Ltd.,* 846 F.Supp. 542, 550 (S.D.Tex.1994), *aff'd,* 78 F.3d 1575 (Fed.Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996).

**29.** These other customers may be able to invoke collateral estoppel to take advantage of the laches ruling that has already been entered against Odetics. Yet it is also possible that some equitable reason, absent from this record, would prevent those customers from invoking the laches defense. In any event, this record provides no basis to depart from the earlier laches ruling, and thus counsels against issuing an injunction barring STK's repair of systems made and sold to unidentified users during the laches period.

contention is unpersuasive for two reasons. First, STK issued a press release the day the jury returned its verdict stating that it has designed an alternative to the pass-thru port that does not infringe the '151 patent and that is expected to be commercially available at the beginning of 1999. Taking STK at its word, it follows that an injunction will not significantly harm STK: If such a product exists, STK will quite soon be able to sell comparable noninfringing products to its customers without violating the injunction. And, in the event this new, alternative product does not become available, then any harm that befalls STK cannot be termed unwarranted, as it stems from STK's own wrongful infringement.[30] In the words of the Federal Circuit, "[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Windsurfing Int'l v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed.Cir.1986).

Second, to be sure, an injunction against STK's future sale and service of infringing devices may well provide Odetics with significant leverage to extract a license fee from STK or its customers. This, however, is the natural and intended result of the statutory grant of monopoly power. *See Smith Int'l*, 718 F.2d at 1578 (observing that if injunctive relief were not granted, "[t]he patent owner would lack much of the 'leverage,' afforded by the right to exclude, to enjoy the full value of his invention in the market place").[31] Thus, STK points to no hardship it will suffer in the event an injunction issues that militates against issuing the injunction.

On the other side of the ledger, Odetics, without an injunction, will suffer the hardship of being denied its right to exclude others from practicing the patent. *See Ortho Pharm. Corp. v. Smith*, 1990 WL 18681, 15 U.S.P.Q.2d 1856, 1863 (E.D.Pa.1990) ("A compulsory license, which may arise from a refusal to enjoin, is fundamentally at odds with the right of exclusion built into our patent system."). While Crestar labels the assertion of this right "a meaningless platitude," the right to exclude is, in fact, a central underpinning of the patent system. *See* 35 U.S.C. § 154.

In sum, a balancing of the potential hardships to each party overwhelmingly supports the issuance of an injunction in the instant circumstances.

### 5. Conclusion

Traditional equitable factors applied and weighed here support the conclusion that an injunction should issue with respect to STK's future manufacture, sale, and use of infringing devices.

### C. Stay Pending Appeal

■ STK argues that if an injunction issues, it should be stayed during the pendency of the appeal. *See* Rule 62(c), Fed. R.Civ.P. In deciding whether to stay entry of an injunction, district courts should consider (i) whether the stay movant has made a strong showing that it is likely to succeed on appeal, (ii) whether the movant will be irreparably injured absent a stay, (iii) whether the issuance of a stay will substantially injure the party seeking the injunction, and (iv) where the public interest lies. *See Hilton v. Braunskill*, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Standard Havens*

---

**30.** *See General Elec. Co. v. New Eng. Elec. Mfg. Co.*, 128 F. 738, 740 (2d Cir.1904) ("If the defendant be honest in his protestations an injunction will do him no harm; if he be dishonest the court should place a strong hand upon him ...."), *quoted in W.L. Gore & Assoc. v. Garlock, Inc.*, 842 F.2d 1275, 1281–82 (Fed.Cir.1988).

**31.** *But see Nerney v. New York, N.H. & H.R. Co.*, 83 F.2d 409, 411 (2d Cir.1936) ("And where ... it is recognized that the only real advantage to a plaintiff in granting the injunction would be to strengthen its position in negotiating a settlement, an injunction should not issue."); *Foster v. American Mach. & Foundry Co.*, 492 F.2d 1317,

1324 (2d Cir.1974) ("An injunction ... is not intended as a club to be wielded by a patentee to enhance his negotiating stance. Here, as the District Court noted, the appellee manufactures a product; the appellant does not. In the assessment of relative equities, the court could properly conclude that to impose irreparable hardship on the infringer by injunction, without any concomitant benefit to the patentee, would be inequitable." (citations omitted)). Notably, neither *Foster* nor *Nerney* is a Federal Circuit case, and neither has been cited by the Federal Circuit. Accordingly, these cases are accorded little weight in the instant analysis.

*Prods., Inc. v. Gencor Indus., Inc.,* 897 F.2d 511, 512 (Fed.Cir.1990). As the Supreme Court and the Federal Circuit have recognized, "the traditional stay factors contemplate individualized judgments in each case, [and] the formula cannot be reduced to a set of rigid rules." *Hilton,* 481 U.S. at 777, 107 S.Ct. 2113, *quoted in Standard Havens,* 897 F.2d at 513. Although eschewing a rigid rule, the Federal Circuit has suggested that a sliding-scale approach be used in evaluating motions for a stay; the stronger a showing the stay movant can make on its likelihood of success on the merits, the less compelling the showing must be with respect to the other three factors. Conversely, if the stay movant can show only a "substantial legal question," then it can obtain a stay only if it prevails on the other three stay factors. *See Standard Havens,* 897 F.2d at 513. Thus, a court entertaining a motion for stay "assesses [the] movant's chances for success on appeal and weighs the equities as they affect the parties and the public." *E.I. DuPont de Nemours & Co. v. Phillips Petroleum,* 835 F.2d 277, 278 (Fed.Cir.1987); *see also Standard Havens,* 897 F.2d at 513 (emphasizing that the four stay factors, "taken individually, are not dispositive").

### 1. *Likelihood of Success*

A stay movant need not prove at the district court that its chances of prevailing on appeal are greater than fifty percent; by definition it has already failed in that attempt. Nonetheless, as discussed above, the strength of a movant's showing on this prong affects the burden it must carry with respect to the other three factors. In any event, the

movant must show that its appeal raises at least a "substantial legal question[ ]." *See DuPont,* 835 F.2d at 278.

As examples of the questions it proposes to raise on appeal, STK cites its arguments for judgment as a matter of law on the issue of infringement, for a new trial on damages, and for a new trial based on the exclusion of its evidence of invalidity under 35 U.S.C. § 102(g).[32] Although the Court is confident that it ruled correctly on these matters, it cannot fairly be said that none raises a "substantial legal question." Equally true, however, is that STK has not shown a "strong likelihood of success on the merits" on any of these issues. *See Standard Havens,* 897 F.2d at 513.

### 2. *Irreparable Injury to STK*

STK would suffer minimal, if any, cognizable injury from an order that denied a stay of the injunction. If the injunction goes into effect immediately, STK argues that it will lose business during the pendency of the appeal if its customers, because of the injunction, buy comparable products from or to enter into service agreements with one of STK's competitors. Yet, this argument is unconvincing, given that any stay that issues is not likely to last more than a year or so (the likely duration of an appeal), and further given that most companies that use tape data storage systems likely have already committed themselves either to STK or to one of its competitors. Accordingly, this factor, in the context of this case, does not support a stay.

---

**32.** STK introduced such evidence of invalidity at the first trial. Although, pursuant to a special verdict form, the first jury made certain findings arguably adverse to STK relating to two predicate issues for § 102(g) invalidity, that jury never reached the ultimate validity question because it returned a verdict of noninfringement. When Odetics appealed from the jury's verdict of noninfringement, STK did not cross-appeal the arguably adverse predicate § 102(g) findings, apparently because the jury did not reach a final conclusion on this issue. *See Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 333, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) ("A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it"); *Electrical Fittings*

*Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 242, 59 S.Ct. 860, 83 L.Ed. 1263 (1939) ("[A] party may not appeal from a judgment or decree in his favor for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree."). In noting STK's failure to appeal, the Federal Circuit cited in its decision and mandate *Radio Steel & Mfg. Co. v. MTD Products, Inc.,* 731 F.2d 840, 844 (Fed.Cir. 1984), which held that a party cannot argue on appeal an issue that it lost below and on which it did not cross-appeal. Given this citation, this Court construed the Federal Circuit's mandate as precluding STK from introducing evidence at the second trial suggesting that the '151 patent was invalid under § 102(g).

### 3. *Substantial Injury to Odetics*

A stay of the injunction will not substantially harm Odetics. To prevent any significant financial injury to Odetics caused by a stay during the appeal, STK would be required to post a bond, pursuant to Rule 62(d), Fed.R.Civ.P., in an amount based on the 4% running royalty rate established by the jury to compensate Odetics for any infringement that occurs while the appeal is pending. Of course, a stay would amount to compelling Odetics to grant STK a license for the duration of the appeal, thereby depriving Odetics of the full benefit of its statutory monopoly right to decide whether, when, and to whom to license its '151 patent—but only for the duration of the appeal. Thus, while significant in the injunction calculus, this harm is not decisive in the stay context. Were this not so, such harm, present in every case, would always preclude issuance of a stay.

Several other facts suggest that a stay would not substantially harm Odetics. First, because Odetics does not manufacture a competing product, permitting STK to remain active in the market during the pendency of the appeal would not threaten any of Odetics's current lines of business. *See Standard Havens*, 897 F.2d at 515 (injunction stayed because, *inter alia*, plaintiff made no showing of "noncompensable injury such as lost market share"). Further, Odetics waited nearly seven years after STK introduced its pass-thru ports before bringing this action. Then, even after instituting the action, Odetics failed to move for a preliminary injunction. Odetics's conduct thus indicates that the presence of the STK systems in the market is not as unduly burdensome as Odetics argues. Moreover, given that Odetics has granted other companies licenses under the '151, and further given that it no longer practices the patent, there is a lesser likeli-

hood that a stay would cause any substantial harm. *See DuPont,* 835 F.2d at 277 (injunction stayed because patentee had previously licensed patent and was divesting business unit that had been practicing the invention).[33]

### 4. *Public Interest*

The public interest does not favor a stay. To be sure, Visa and Crestar use the STK systems for storage, handling, and retrieval of data related to credit card and other financial transactions, and defendants correctly note that the public has an interest in avoiding disruption of these transactions. But this public interest is not implicated by the injunction contemplated here, namely an injunction barring only STK's future manufacture and sale of infringing systems, not Visa's and Crestar's future use of their systems, and not maintenance and repair of the systems, whether by STK or another entity. Moreover, if STK's customers, including Visa and Crestar, expect that they will need additional, similar tape storage systems in the future, they can plan now to purchase noninfringing systems (perhaps STK's promised "design-around" system) and adjust their operations accordingly. Alternatively, before the need for these additional systems arises, either STK or its customers could negotiate a license under the '151 patent and thus avoid having to switch to a different product. In short, STK's customers can plan adequately for whatever contingencies may arise as a result of an injunction barring STK's future sale and manufacture of infringing systems, and thus the public's interest in the uninterrupted use and benefits of tape storage systems will not suffer.

Finally, issuance of a stay in these circumstances would not be in the public interest, as it would delay Odetics's ability to exercise its

---

**33.** In support of its argument of substantial injury, Odetics cites *Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 426–29, 28 S.Ct. 748, 52 L.Ed. 1122 (1908), and *King Instr. Corp. v. Perego,* 65 F.3d 941, 949–50 (Fed.Cir. 1995), both of which hold that a patentee need not practice the infringed patent in order to enjoin an infringer. While that principle surely is true, it is of no moment here. STK's emphasis on the fact that Odetics does not compete in this market is not directed towards showing that Odetics has no right to enjoin STK, but only to show that a stay of the injunction against STK pending appeal would not substantially harm Odetics.

It is worth iterating that Odetics would not be *substantially* harmed because if a stay were to issue, Odetics would be foreclosed from exercising its exclusive right under the Patent Act only for the duration of the appeal, and no longer.

statutorily granted monopoly power. *See* 35 U.S.C. § 154.

### 5. *Conclusion*

On balance, the four factors in the stay calculus point to the conclusion that the injunction should not be stayed pending appeal. Although there may be a "substantial legal question" for appeal, there is no convincing evidence either that STK will suffer significant irreparable harm or that the public interest will be ill served if the injunction issues immediately. Put another way, because STK only raised a substantial legal question but did not make a strong showing of likelihood of success on appeal, it was required to prevail on the latter three stay factors. And because it was not able to do so, issuance of a stay is not warranted in these circumstances.

### III

To summarize, then, Visa will not be enjoined from using any infringing systems purchased after the complaint because there is an implied license as to those systems. Nor, given the laches ruling, will Visa or Crestar be enjoined from using the systems they purchased prior to the filing of the complaint. From this it also follows that STK will be permitted to continue routine service and repair of all systems owned by its customers, including Visa and Crestar, as of this date. STK will be enjoined, however, from the future manufacture, sale, and use of infringing systems. Finally, this injunction will not be stayed during the pendency of the appeal.

An appropriate Order will issue.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.